NON-CONFIDENTIAL

**2015-1489**

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

PAPIERFABRIK AUGUST KOEHLER SE,

Plaintiff-Appellant,

v.

UNITED STATES, APPVION, INC.,

Defendants-Appellees.

Appeal from the United States Court of International Trade
in Case No. 13-CV-00163, Senior Judge Nicholas Tsoucalas.

**RESPONSE BRIEF OF APPVION, INC.**

Gilbert B. Kaplan
Daniel L. Schneiderman
KING & SPALDING LLP
1700 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
(202) 737-0500

*Counsel for Appvion, Inc.*

October 21, 2015

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

PAPIERFABRIK AUGUST KOEHLER SE v. US

2015-1489

<u>Certificate of Interest</u>

Counsel for Defendant-Appellee, Appvion, Inc. (formerly Appleton Papers Inc.), certifies the following (use "None" if applicable; use extra sheets if necessary):

1.     The full name of every party or amicus represented by me is:

Appvion, Inc. (formerly Appleton Papers Inc.)

2.     The name of the real party in interest  (if the party named in the caption is not the real party in interest) represented by me is:

Same

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

No publicly held company owns 10 percent or more of  Appvion, Inc.  Appvion, Inc. is 100 percent owned by Paperweight Development Corp., which is 100 percent owned by the Appvion, Inc. Employee Stock Ownership Trust.

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

King & Spalding LLP - Gilbert B. Kaplan and Daniel L. Schneiderman

October 21, 2015                          /s/ *Gilbert B. Kaplan*
Date                                              Gilbert B. Kaplan

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES…………………………………………………...iii

STATEMENT OF RELATED CASES ................................................................1

STATEMENT OF THE ISSUES.......................................................................1

STATEMENT OF THE CASE...........................................................................2

STATEMENT OF THE FACTS .........................................................................2

SUMMARY OF ARGUMENT ..........................................................................5

ARGUMENT ......................................................................................................6

I.     COMMERCE'S DECISION TO APPLY TOTAL, RATHER THAN
       PARTIAL, ADVERSE FACTS AVAILABLE IS SUPPORTED BY
       SUBSTANTIAL EVIDENCE AND IS IN ACCORDANCE WITH
       LAW ........................................................................................................6

II.    COMMERCE'S SELECTION OF THE 75.36 PERCENT PETITION
       RATE AS ADVERSE FACTS AVAILABLE IS SUPPORTED BY
       SUBSTANTIAL EVIDENCE AND IS IN ACCORDANCE WITH
       LAW ......................................................................................................14

       A.     The Statute Authorizes Use Of The Petition Rate .............................14

       B.     The Petition Rate Is Corroborated......................................................20

              1.     Commerce's finding that the relevant sale is not
                     aberrational is supported by substantial evidence ...................21

              2.     Commerce reasonably corroborated the petition rate
                     using Koehler's highest transaction-specific margin from
                     AR2 ...........................................................................................22

              3.     The corroboration analysis does not rely on data that
                     Commerce found to be unreliable...............................................29

              4.     Even if Commerce erred in relying on Koehler's highest
                     transaction-specific margin, such error was harmless, and
                     no remand should be ordered.....................................................32

C.    The Petition Rate Is Not "Punitive" ....................................................35

III.   COMMERCE'S REJECTION OF KOEHLER'S "REVISED" SALES
       DATA WAS IN ACCORDANCE WITH LAW ...........................................38

       A.    Commerce's Decision Complied With 19 U.S.C. § 1677m(d)...........39

       B.    Commerce Correctly Determined That Koehler Failed To Meet
             The Requirements Of 19 U.S.C. § 1677m(e)......................................46

             1.    Koehler's "Revised" Sales Listing Was Untimely ..................47

             2.    Koehler Did Not Act To The Best Of Its Ability ....................49

             3.    The Information Could Not Be Verified...................................50

       C.    Commerce Did Not "Abuse Its Discretion" In Rejecting
             Koehler's Untimely Submission .........................................................52

       D.    Even If Rejection Of Koehler's "Revised" Home Market Sales
             Listing Were Improper, It Would Not Undermine The Basis For
             Applying Total Adverse Facts Available ............................................55

CONCLUSION ......................................................................................................56

<u>CONFIDENTIAL MATERIAL OMITTED</u>

The material omitted from brackets on pages 4, 21, 32, and 51 relates to information for which Plaintiff-Appellant Papierfabrik August Koehler SE claimed confidential treatment during the underlying administrative proceedings.  In particular, the material omitted on pages 4 and 51 relates to Koehler's fraud scheme, and the material omitted on pages 21 and 32 relates to transaction-specific margins for Koehler's sales.

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
  925 F. Supp. 2d 1315 (Ct. Int'l Trade 2013),
  *aff'd,* No. 2014-1514, 1647, 2015 U.S. App. LEXIS 17449 (Fed.
  Cir. Oct. 5, 2015) ............................................................................8

*Ad Hoc Shrimp Trade Action Comm. v. United States,*
  992 F. Supp. 2d 1285 (Ct. Int'l Trade 2014),
  *aff'd,* No. 2014-1514, 1647, 2015 U.S. App. LEXIS 17449 (Fed.
  Cir. Oct. 5, 2015) .........................................................................8, 9

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
  No. 2014-1514, 1647, 2015 U.S. App. LEXIS 17449 (Fed. Cir.
  Oct. 5, 2015) ..........................................................................*passim*

*Agro Dutch Indus. Ltd. v. United States*,
  31 CIT 2047 (2007) ..........................................................................42

*Dongguan Sunrise Furniture Co. v. United States*,
  931 F. Supp. 2d 1346 (Ct. Int'l Trade 2013) .....................................24

*Dongguan Sunrise Furniture Co. v. United States*,
  997 F. Supp. 2d 1330 (Ct. Int'l Trade 2014) ...................24, 25, 26, 37

*Dongtai Peak Honey Indus. Co. v. United States*,
  777 F.3d 1343 (Fed. Cir. 2015) ...................................................25, 53

*Essar Steel Ltd. v. United States*,
  678 F.3d 1268 (Fed. Cir. 2012) ...................................................43, 53

*Essar Steel Ltd. v. United States*,
  753 F.3d 1368 (Fed. Cir. 2014) ........................................................27

*F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*,
  216 F. 3d 1027 (Fed. Cir. 2000) .....................................14, 32, 33, 34

*Gallant Ocean (Thai.) Co. v. United States*,
  602 F.3d 1319 (Fed. Cir. 2010) ................................14*,* 24, 27, 28, 29

*Gerber Food (Yunnan) Co. v. United States*,
    387 F. Supp. 2d 1270 (Ct. Int'l Trade 2005) ................................................10, 11

*Gerber Food (Yunnan) Co. v. United States*,
    491 F. Supp. 2d 1326 (Ct. Int'l Trade 2007) ................................................49, 50

*GPX Int'l Tire Corp. v. United States*,
    678 F.3d 1308 (Fed. Cir. 2012) .........................................................................14

*Hubscher Ribbon Corp. v. United States*,
    942 F. Supp. 2d 1375 (Ct. Int'l Trade 2013) ....................................................16

*Hubscher Ribbon Corp. v. United States*,
    979 F. Supp. 2d 1360 (Ct. Int'l Trade 2014) ................................................28, 29

*Jiangsu Changbao Steel Tube Co. v. United States*,
    884 F. Supp. 2d 1295 (Ct. Int'l Trade 2012) .......................................8, 9, 10, 11

*KYD, Inc. v. United States*,
    613 F. Supp. 2d 1371 (Ct. Int'l Trade 2009),
    *aff'd*, 607 F.3d 760 (Fed. Cir. 2010)...................................................................16

*KYD, Inc. v. United States*,
    607 F.3d 760 (Fed. Cir. 2010) .....................................................................25, 36

*Lifestyle Enter., Inc. v. United States*,
    768 F. Supp. 2d 1286 (Ct. Int'l Trade 2011) ................................................24, 27

*Lifestyle Enter., Inc. v. United States*,
    865 F. Supp. 2d 1284 (Ct. Int'l Trade 2012) ....................................................15

*Myland Indus., Ltd. v. United States*,
    31 CIT 1696 (2007) ...........................................................................................44

*Nan Ya Plastics Corp. v. United States*,
    6 F. Supp. 3d 1362 (Ct. Int'l Trade 2014) ...................................................22, 23

*Nippon Steel Corp. v. United States*,
    337 F.3d 1373 (Fed. Cir. 2003) ........................................................................49

*NTN Bearing Corp. v. United States*,
    74 F.3d 1204 (Fed. Cir. 1995) .................................................11, 12, 13, 45, 52

*PAM, S.p.A. v. United States,*
    582 F.3d 1336 (Fed. Cir. 2009) ....................................................20, 23

*Papierfabrik August Koehler SE v. United States,*
    7 F. Supp. 3d 1304 (Ct. Int'l Trade 2014) ....................................*passim*

*Papierfabrik August Koehler SE v. United States,*
    44 F. Supp. 3d 1356 (Ct. Int'l Trade 2015) .........................................2, 4, 11, 31

*PSC VSMPO-AVISMA Corp. v. United States,*
    755 F. Supp. 2d 1330 (Ct. Int'l Trade 2011),
    *aff'd*, 498 Fed. App'x 995 (Fed. Cir. 2013).........................................21

*PSC VSMPO-AVISMA Corp. v. United States,*
    688 F.3d 751 (Fed. Cir. 2012) ...........................................................53

*Qingdao Taifa Group Co. v. United States,*
    780 F. Supp. 2d 1342 (Ct. Int'l Trade 2011),
    *aff'd*, 467 Fed. App'x 887 (Fed. Cir. 2012) .........................................29

*QVD Food Co. v. United States,*
    658 F.3d 1318 (Fed. Cir. 2011) .....................................................18, 30

*Steel Auth. of India v. United States,*
    149 F. Supp. 2d 921 (Ct. Int'l Trade 2001) ....................................7, 11

*Ta Chen Stainless Steel Pipe, Inc. v. United States,*
    298 F.3d 1330 (Fed. Cir. 2002) ..........................................................23

*Tianjin Magnesium Int'l Co. v. United States,*
    844 F. Supp. 2d 1342 (Ct. Int'l Trade 2012) ...................... 42, 43, 44, 50, 53, 54

*Timken U.S. Corp. v. United States,*
    434 F.3d 1345 (Fed. Cir. 2006) ....................................................13, 42, 45, 52

*Tung Mung Dev. Co. v. United States,*
    25 CIT 752 (2001) .............................................................................39

## Statutes

19 U.S.C. § 1516a ...............................................................................13

19 U.S.C. § 1516a(b)(2)....................................................................18, 30

19 U.S.C. § 1677e ..........................................................34, 36, 49, 50

19 U.S.C. § 1677e(a)..............................................................................12

19 U.S.C. § 1677e(a)(1)...........................................................................55

19 U.S.C. § 1677e(a)(2)...........................................................................55

19 U.S.C. § 1677e(a)(2)(A) .....................................................................55

19 U.S.C. § 1677e(a)(2)(B)......................................................................55

19 U.S.C. § 1677e(a)(2)(C)......................................................................55

19 U.S.C. § 1677e(a)(2)(D) .....................................................................56

19 U.S.C. § 1677e(b)(1)............................................................15, 19, 20

19 U.S.C. § 1677e(c)..................................................................15, 19, 27

19 U.S.C. § 1677e(d)(3) ..........................................................................34

19 U.S.C. § 1677m...................................................................................50

19 U.S.C. § 1677m(d) ....................................................................*passim*

19 U.S.C. § 1677m(e) ........................................................6, 38, 39, 45, 46

19 U.S.C. § 1677m(e)(1)...............................................................46, 49

19 U.S.C. § 1677m(e)(2)...............................................................46, 52

19 U.S.C. § 1677m(e)(4)...............................................................46, 50

19 U.S.C. § 3533 ......................................................................................14

19 U.S.C. § 3538......................................................................................14

28 U.S.C. § 2637(d) .................................................................................13

Trade Preferences Extension Act of 2015,
    Pub. L. No. 114-27, § 502, 129 Stat. 362 ..........................................34

**Agency Regulations and Determinations**

19 C.F.R. § 351.202(b)(7)(i)(B)..............................................................................19

*Certain Frozen and Canned Warmwater Shrimp from Brazil,*
    *Ecuador, India, Thailand, the People's Republic of China, and the*
    *Socialist Republic of Vietnam,*
    69 Fed. Reg. 3876 (Dep't of Commerce Jan. 27, 2004).....................................20

*Certain Frozen Warmwater Shrimp from Thailand,*
    72 Fed. Reg. 52065 (Dep't of Commerce Sept. 12, 2007) ................................24

*Dates of Application of Amendments to the Antidumping and*
    *Countervailing Duty Laws Made by the Trade Preferences*
    *Extension Act of 2015,*
    80 Fed. Reg. 46793 (Dep't of Commerce Aug. 6, 2015) ..................................34

*Lightweight Thermal Paper from Germany,*
    78 Fed. Reg. 23220 (Dep't of Commerce April 18, 2013)........................*passim*

## STATEMENT OF RELATED CASES

In accordance with Rule 47.5 of the U.S. Court of Appeals for the Federal Circuit, counsel for Defendant-Appellee Appvion, Inc. ("Appvion") states that no other appeal in or from this civil action in the lower court was previously before this or any other appellate court, nor is any case known to counsel to be pending in this or any other court that will directly affect or be directly affected by this Court's decision in this appeal.

## STATEMENT OF THE ISSUES

This appeal involves the following issues:

1.    Whether the Trade Court correctly affirmed the decision by the United States Department of Commerce ("Commerce") to apply total adverse facts available ("AFA") when calculating a dumping margin for Plaintiff-Appellant Papierfabrik August Koehler SE ("Koehler"), which submitted fraudulent questionnaire responses in the underlying third administrative review ("AR3") of the antidumping order on lightweight thermal paper ("LWTP") from Germany.

2.    Whether the Trade Court correctly affirmed Commerce's use of the 75.36 percent petition margin as the AFA rate assigned to Koehler, when that rate was significantly lower than the highest transaction-specific margin that had been calculated for Koehler during the previous second administrative review ("AR2") of the same antidumping order.

3.     Whether the Trade Court correctly affirmed Commerce's decision to reject from the record Koehler's untimely submission of information that had been intentionally concealed from the company's initial questionnaire responses.

## STATEMENT OF THE CASE

This case involves the third administrative review of the antidumping order on LWTP from Germany, encompassing entries during the 2010/2011 period of review. *Lightweight Thermal Paper from Germany*, 78 Fed. Reg. 23220 (Dep't of Commerce April 18, 2013) ("*Final Results*") (JA 1952-54).  *See also Issues and Decision Memorandum for the Final Results* (April 10, 2013) ("*IDM*") (JA 1930-51).

In the *Final Results*, Commerce calculated a dumping margin for Koehler of 75.36 percent based on total AFA.  Koehler appealed to the Court of International Trade, which sustained the *Final Results*.  *Papierfabrik August Koehler SE v. United States*, 7 F. Supp. 3d 1304 (Ct. Int'l Trade 2014) ("*Koehler I*") (JA 7).  The Trade Court also denied Koehler's motion to amend the judgment.  *Papierfabrik August Koehler SE v. United States*, 44 F. Supp. 3d 1356 (Ct. Int'l Trade 2015) ("*Koehler II*") (JA 16).  This appeal ensued.

## STATEMENT OF THE FACTS

We disagree with Koehler's recitation of the facts at pages 2-11 of its opening brief ("*Koehler Br.*").  Koehler submitted a fraudulent questionnaire

response during the underlying review.  That fraud had been planned long in advance.  As Commerce found, this was "an extraordinary situation where Koehler conspired with multiple parties, long before the relevant review even began, to systematically structure its sales, pricing, and shipping procedures in such a way that would enable it to defraud the United States government."  Preliminary Results AFA Memorandum (Dec. 3, 2012) ("*Preliminary AFA Memorandum*") at 14 (JA 1172); Issues and Decision Memorandum for the Preliminary Results of AD Review (Dec. 3, 2012) ("*Preliminary Decision Memorandum*") at 4 (JA 1702).  In particular, "Koehler engaged in a transshipment scheme" in which it shipped its highest-priced home market sales of the matching products through a third-country (even though Koehler knew the merchandise was destined for consumption in Germany).  *IDM* at 2 and 20 (JA 1931 and 1949).  The transshipments were made so that, when Commerce ultimately reviewed the 2010/2011 period, these sales could be concealed from Koehler's antidumping sales response.  That is exactly what happened.  Koehler omitted these reportable home market sales from its February 27, 2012 Section B Questionnaire Response (JA 359-433), and thus it "knowingly and deliberately submitted a fraudulent initial questionnaire response." *Preliminary AFA Memorandum* at 15-16 (JA 1728-29).  *See also IDM* at 9 ("Koehler intended to submit deficient, incomplete, and fraudulent questionnaire responses to the Department") (JA 1938).

3

Confidential Material Subject To Protective Order Deleted

In its statement of the facts, Koehler portrays itself as the unwitting victim of a "small number of Koehler employees" who engaged in this scheme "without the knowledge or approval of their supervisors" or "senior management."  *Koehler Br.* at 4.  These assertions represent nothing more than Koehler's self-serving litigating position designed to paint the company, misleadingly, in a sympathetic light.  They are not findings made by Commerce, and they are unsupported by any record evidence.  As the Trade Court explained,

> Koehler's argument that "supervisors" and "senior management" were unaware of the transshipments is not supported by the record.  The sole basis for this argument is Koehler's own statement that its Chief Executive Officer, Chief Financial Officer, in-house counsel, and directors were unaware of the transshipments. *See* SQR at 1.  However, Koehler did not provide Commerce with any evidence supporting this claim during the review, and its attempt to extend this claim to the vaguely-titled "supervisors" and "senior management" is similarly undocumented.

*Koehler I*, 7 F. Supp. 3d at 1311 (JA 10).  *See also Koehler II*, 44 F. Supp. 3d at 1358 (JA 17).

Moreover, Koehler's portrayal is false.  As the Trade Court observed, Koehler's assertions on appeal contradict its own admission made during the review "that [                                             ]."  *See Koehler I*, Slip Op. 14-102 (Ct. Int'l Trade Sept. 3, 2014) (confidential slip opinion) at 11 (JA 15K), *see also* Koehler's First Supplemental Questionnaire Response (June 27,

2012) at 4 (JA 1043). Indeed, given Commerce's findings that Koehler's scheme (1) was pre-planned, (2) had to be "coordinated with multiple parties," and (3) required Koehler to "structure its sales, pricing, and shipping procedures in a manner that would enable it to manipulate its sales prices reported to the Department," *Preliminary AFA Memorandum* at 15 (JA 1728), it strains credulity to believe that the scheme was designed and implemented exclusively by low-level employees acting independently. There is no reason why this Appeals Court should give any more credence to Koehler's assertions than did the Trade Court.

## SUMMARY OF ARGUMENT

The judgment of the Trade Court should be affirmed. Commerce's application of total (rather than partial) AFA was supported by substantial evidence and was in accordance with law. Koehler's fraud rendered its entire questionnaire response unreliable and unusable. The courts have repeatedly upheld Commerce's application of total AFA in cases, such as this one, where a respondent intentionally conceals or reports false information.

In addition, Commerce acted well within its discretion in selecting the 75.36 percent petition margin as the AFA rate. That rate is corroborated by the highest transaction-specific margin that had been calculated for Koehler in the previous AR2. Moreover, although the petition rate may include a "built-in increase intended as a deterrent to non-compliance," it is not punitive or unreasonably high.

5

The alternative lower AFA rates proposed by Koehler are insufficient to deter fraud, and their use would frustrate (rather than further) the purpose of the AFA provision.

Finally, Commerce properly rejected Koehler's untimely submission of the sales data that had been intentionally concealed from the company's initial response. Commerce's decision fully complied with the requirements of 19 U.S.C. § 1677m(d) & (e). Moreover, there is no reason to order a remand on this issue, because the application of total AFA was appropriate regardless of whether or not Koehler's revised sales listing had been accepted onto the record.

## ARGUMENT

**I.    COMMERCE'S DECISION TO APPLY TOTAL, RATHER THAN PARTIAL, ADVERSE FACTS AVAILABLE IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND IS IN ACCORDANCE WITH LAW**

Koehler argues that Commerce erred in applying total, rather than partial, AFA, because (1) "the omitted home market sales constituted a discrete category of information," (2) the "fraud had no bearing on the vast amount of usable data that Koehler submitted in its original questionnaire response," and (3) the "usable data … could have been easily verified." *Koehler Br.* at 14. Koehler is wrong.

The deficiencies in Koehler's response were not limited to a "discreet category of information," and it is untrue that Koehler's "fraud had no bearing" on other aspects of the questionnaire responses. Although Koehler claims that the

"omitted sales represented an identifiable subset of Koehler's overall home market sales," *id.*, there is no record evidence quantifying the scale of those omissions. Koehler claims that "Commerce never identified specific deficiencies in Koehler's U.S. sales or cost data." *Id*. at 15. A dumping margin cannot be calculated, however, without a complete and accurate home market sales listing, which forms the basis for normal value. Where, as here, the home market sales file is unusable, Commerce need not employ partial AFA to "fill the gaps"; rather, it may resort to total AFA. *Steel Auth. of India v. United States*, 149 F. Supp. 2d 921, 979-29 (Ct. Int'l Trade 2001).

Moreover, the exceptional nature of Koehler's misconduct in this case undermined not only the reliability of the home market sales file, but the entire questionnaire response. As Commerce quite reasonably found, the "extent of Koehler's material misrepresentation in this case rendered Koehler's questionnaire responses wholly unreliable and unusable." *IDM* at 8 (JA 1937). *See also id*. at 6 (JA 1935) ("the actions taken by Koehler undermine the reliability and credibility of Koehler's entire set of questionnaire responses") and 13 ("Koehler concealed certain otherwise reportable home market sales transactions, thus undermining the credibility and reliability of Koehler's data overall") (JA 1942); *Preliminary Decision Memorandum* at 11 (same) (JA 1710). Commerce concluded that "application of total AFA rather than partial AFA is warranted because, due to

7

Koehler's deliberate scheme to conceal home market sales and manipulate home market price data, as well as Koehler's submission of the {questionnaire responses} based on fraudulent data, it is not possible to reach any reliable conclusions based on Koehler's questionnaire responses." *IDM* at 7 (JA 1936).

The Trade Court has repeatedly upheld Commerce's decision to reject entire responses in similar cases. As the Trade Court explained, "it is reasonable to infer that a respondent who admits to having intentionally deceived Commerce officials, and does so only after Commerce itself supplies contradictory evidence, exhibits behavior suggestive of a general willingness and ability to deceive and cover up the deception until exposure becomes absolutely necessary." *Jiangsu Changbao Steel Tube Co. v. United States*, 884 F. Supp. 2d 1295, 1306 (Ct. Int'l Trade 2012). Thus, "the inference that a respondent's failure to disclose willful deception until faced with contradictory evidence implicates the reliability of that respondent's remaining representations is reasonable." *Id.* *See also Ad Hoc Shrimp Trade Action Comm. v. United States,* 925 F. Supp. 2d 1315, 1323 (Ct. Int'l Trade 2013) ("*Ad Hoc Shrimp I*") (same). This inference, in other words, is not limited to the discreet area of the fraud; rather, "misrepresentations may reasonably be inferred to pervade the data in the record beyond that which Commerce has positively confirmed as misrepresented." *Ad Hoc Shrimp Trade Action Comm. v. United States,* 992 F. Supp. 2d 1285, 1293 (Ct. Int'l Trade 2014) ("*Ad Hoc Shrimp II"*).

8

This Appeals Court recently upheld the Trade Court's analysis. *Ad Hoc Shrimp Trade Action Comm. v. United States*, No. 2014-1514, 1647, 2015 U.S. App. LEXIS 17449 at *55 (Fed. Cir. Oct. 5, 2015) ("*Ad Hoc Shrimp III*"). Hilltop, the uncooperative respondent in the *Ad Hoc Shrimp* litigation, argued on appeal that certain misrepresentations regarding an affiliation did not affect other aspects of its antidumping response, which it claimed could have been used (together with partial AFA) to calculate a margin. As this Court concluded, however, "Commerce properly determined … that Hilltop's misrepresentations rendered the entirety of its submissions unreliable." *Id.*, at *43-44. In particular, Commerce's decision was appropriately based "on the impeachment of Hilltop's credibility as a consequence of evidence reasonably indicating that Hilltop deliberately withheld and misrepresented information, and these misrepresentations may reasonably be inferred to pervade the data in the record beyond that which Commerce has positively confirmed as misrepresented." *Id.*, citing *Ad Hoc Shrimp II*. Moreover, "Commerce also properly applied total AFA, as opposed to partial AFA, because Hilltop's failure to disclose its affiliates and its misrepresentations undermined all of Hilltop's submissions regarding its ownership and corporate structure." *Id.*

Koehler, like the respondents in *Jiangsu Changbao* and *Ad Hoc Shrimp*, intentionally deceived Commerce by omitting reportable home market sales.

Moreover, Koehler did not voluntarily disclose its fraud; rather, Koehler admitted to the omissions only after the transshipment scheme had been revealed by the Petitioner. *IDM* at 12 (JA 1941). *See also Koehler I*, 7 F. Supp. 3d at 1308 (JA 8). As in *Jiangsu Changbao* and *Ad Hoc Shrimp*, therefore, it was reasonable for Commerce to conclude that Koehler's entire response was unreliable.

Koehler argues that there have been other cases where an error in one aspect of a response did not render the entire response unreliable or unusable, and partial AFA was used to "fill in the gaps." *Koehler Br*. at 16-20. That may be true. But none of the cited cases involved fraud or other intentional misconduct undermining the reliability of the respondent's entire submission. Koehler argues that *Gerber Food (Yunnan) Co. v. United States*, 387 F. Supp. 2d 1270 (Ct. Int'l Trade 2005) precludes Commerce from disregarding data submissions even where "omissions or inaccuracies were due to misconduct by the respondent." *Koehler Br.* at 16-17. But that is plainly false. After all, there have been multiple fraud cases since *Gerber*, including *Jiangsu Changbao* and *Ad Hoc Shrimp*. In each of those cases, the Courts have upheld application of total AFA and endorsed the practice of finding entire responses to be unreliable where there has been intentional deception in one aspect of the response.

As the Trade Court explained in this case,

> Commerce's decision to apply total AFA was reasonable.
> This was not, as Koehler suggests, a case where the

10

respondent's conduct affected only a discrete category of information. *Cf. Gerber Food (Yunnan) Co. v. United States*, 29 CIT 753, 764-67, 387 F. Supp. 2d 1270, 1281-83 (2005) (total AFA was inappropriate where respondent's failure to disclose its export agency arrangement did not affect the data necessary to calculate the dumping margin). Koehler views its conduct too narrowly. Here, Koehler manipulated its sales data by concealing certain home market sales detrimental to its dumping margin. *See* SQR at 1-4. The effects of this conduct extended beyond the omitted sales because Commerce could not make the comparisons between the normal value and U.S. prices necessary for calculating the dumping margin. *See Steel Auth.*, 25 CIT at 486, 149 F. Supp. 2d at 927 (recognizing that accurate home market sales, U.S. sales, costs, and constructed value data are "necessary" to the dumping margin calculation). Because Koehler's sales data was incomplete and unreliable, Commerce reasonably concluded that it could not calculate the dumping margin using this data.

*Koehler I*, 7 F. Supp. 3d at 1314 (JA 12). *See also Koehler II*, 44 F. Supp. 3d at

1358 (JA 17) ("Commerce's decision to apply total AFA was appropriate, because

by concealing certain home market sales necessary for calculating the dumping

margin, Koehler undermined both the credibility and reliability of its data

overall").

Koehler argues that *Koehler I* and similar cases like *Jiangsu Changbao* and

*Ad Hoc Shrimp* violate this Court's holding in *NTN Bearing Corp. v. United States*,

74 F.3d 1204, 1208 (Fed. Cir. 1995). According to Koehler, *NTN* overturned

Commerce's rejection of a respondent's data – which Commerce suspected "may

not be correct" – as "purely speculative." *Koehler Br.* at 20. *NTN* is off point,

however, because it involved clerical data-entry errors by the respondent, not fraud or other intentional misconduct. *NTN*, 74 F.3d at 1207-08. In this case, Commerce did not find Koehler's response to be unreliable because of a clerical error (such as the "error in data transfer" that caused Koehler to omit certain other sales from its initial response). *See Koehler Br*. at 7. Rather, it found Koehler's response to be unreliable because Koehler, unlike *NTN*, intentionally concealed information and submitted a fraudulent questionnaire response.

Koehler contends that Commerce could have conducted a verification of its home market sales data. *Id*. at 21. According to Koehler, Commerce did verify that the company submitted a complete home market sales file (including certain transshipped sales) in a subsequent fourth administrative review ("AR4"). *Id*. But that is irrelevant. Even if Koehler's data "could" have been verified in this AR3, Commerce was under no obligation to conduct such a verification. Commerce found that total AFA was warranted under 19 U.S.C. § 1677e(a) not merely because the data could not be verified, but also because Koehler (a) withheld information, (b) failed to provide information by the applicable deadlines, and (c) significantly impeded the proceeding. *IDM* at 7 (JA 1936). Koehler does not contest any of these other factors, each of which independently is sufficient to support application of total facts available. Moreover, the reason why the questionnaire responses were unverifiable was because of their unreliability

12

resulting from Koehler's fraud.  *Id*.  In the subsequent AR4 referenced by Koehler, there was no allegation of fraud or concealment of any transshipped sales.  *See Koehler I*, 7 F. Supp. 3d at 1312, n.7 (JA 10-11).  The fact that Commerce conducted a verification in AR4 (which had not even occurred at the time of the AR3 *Final Results* now under review) has no bearing on this case.

Koehler claims that, in *Timken U.S. Corp. v. United States*, 434 F.3d 1345, 1354 (Fed. Cir. 2006), this Appeals Court found that Commerce cannot reject information as unverifiable without first attempting to conduct a verification. *Koehler Br*. at 21.  But that case, like *NTN*, involved information submitted to correct clerical errors.  Nothing in *Timken* implies an obligation on Commerce to conduct verifications in cases of fraud.

Finally, Koehler argues that Commerce's decision to apply total AFA violated the United States' treaty obligations as interpreted in various WTO Appellate Body and Panel decisions.  *Koehler Br*. at 51 and 55.  Koehler failed to exhaust these arguments; they were never presented to Commerce during the underlying review or to the Trade Court on appeal, and they should not be considered for the first time now.  28 U.S.C. § 2637(d).  Moreover, judicial review under 19 U.S.C. § 1516a is not the appropriate means by which to raise such challenges.  If Koehler believes that the United States violated its treaty obligations, there are separate procedures under the WTO to challenge its actions,

13

and separate procedures under the Uruguay Round Agreements Act to bring the United States into compliance. 19 U.S.C. §§ 3533 and 3538. This Court has stated that it "will not attempt to perform duties that fall within the exclusive province of the political branches, and we therefore refuse to overturn Commerce's practices based on any ruling by the WTO or other international body unless and until such ruling has been adopted pursuant to the specified statutory scheme." *GPX Int'l Tire Corp. v. United States*, 678 F.3d 1308, 1312 n.2 (Fed. Cir. 2012). In any event, it does not appear that any of the WTO cases cited by Koehler are directly on point; Koehler makes no claim that they involved instances of fraud or intentional concealment by a respondent. *Koehler Br.* at 51, 55.

## II. COMMERCE'S SELECTION OF THE 75.36 PERCENT PETITION RATE AS ADVERSE FACTS AVAILABLE IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND IS IN ACCORDANCE WITH LAW

### A. The Statute Authorizes Use Of The Petition Rate

Koehler presents a hodgepodge of arguments as to why the petition rate cannot be used in this case. *Koehler Br.* at 24-30. Koehler states that the 75.36 percent petition rate is more than "eleven times higher" than the highest margin calculated for it, *i.e.*, 6.50 percent during the original investigation. *Id.* at 30. According to Koehler, a petition rate that is multiple times higher than the highest calculated rate is necessarily "discredited." *Id.*, citing *F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F. 3d 1027 (Fed. Cir. 2000), *Gallant*

*Ocean (Thai.) Co. v. United States*, 602 F.3d 1319 (Fed. Cir. 2010), and *Lifestyle Enter., Inc. v. United States*, 865 F. Supp. 2d 1284, 1291 (Ct. Int'l Trade 2012) ("*Lifestyle III*"). Koehler further claims that, even if the petition rate were not discredited, it cannot be applied to Koehler because it was calculated using information derived from the experience of another company (*i.e.*, Mitsubishi) and using a methodology (*i.e.*, constructed value or "CV") that had not since been applied to Koehler. *Koehler Br.* at 25. These arguments are wrong.

The statute specifically authorizes use of the petition as the basis for AFA. 19 U.S.C. § 1677e(b)(1) (2013). The fact that the petition rate is significantly higher than Koehler's other calculated rates – in segments during which Koehler was cooperative – does not "discredit" the petition. Indeed, as Commerce explained, "by definition, a rate based on inferences adverse to Koehler will normally be higher than the other rates in the proceeding which were calculated without an adverse inference, on order to serve as a deterrent to non-compliance." *IDM* at 21 (JA 1950).

By statute, the petition rate is usable so long as it can be corroborated pursuant to 19 U.S.C. § 1677e(c) (2013), *i.e.*, shown to be both reliable and relevant. In this case, as explained in subpart B below, the petition rate has been corroborated, and the 75.36 percent rate has been shown to be reliable and relevant to Koehler. No more is required. Koehler's citations to *De Cecco*, *Gallant Ocean,*

15

and *Lifestyle III* are unavailing, because in those cases, the petition rates at issue were deemed to be uncorroborated.

The courts have routinely upheld petition rates that are many multiple times higher than the highest calculated rates – where the petition rates are corroborated. *See, e.g., Hubscher Ribbon Corp. v. United States*, 942 F. Supp. 2d 1375, 1378-81 (Ct. Int'l Trade 2013) (finding that a 137.20 percent petition rate was not "discredited" by the fact that no subsequent calculated weighted-average margin exceeded 4.37 percent, because the petition rate could still be corroborated by other information); *KYD, Inc. v. United States*, 613 F. Supp. 2d 1371, 1379 (Ct. Int'l Trade 2009), *aff'd*, 607 F.3d 760 (Fed. Cir. 2010), (finding that a 122.88 percent petition rate had not been "discredited" by the fact that it was "43 times higher than the final 'all others' rate in the initial investigation," because it could still be corroborated by other information).  As this Court recently held, "AFA rates can be significantly higher than rates calculated for cooperating respondents…. Commerce need not select, as the AFA rate, a rate that represents the typical dumping margin for the industry in question." *Ad Hoc Shrimp III*, 2015 U.S. App. LEXIS 17449 at *53-54.

Koehler's prior rates calculated in the investigation and other review segments do not somehow invalidate the petition rate.  As the Trade Court explained below,

16

> Koehler's previous margins are not indicative of its
> commercial reality during AR3 and are, in fact,
> inadequate for the purpose of establishing Koehler's
> AFA rate. Koehler cooperated during the investigation
> and the first review, but during AR3 Koehler concealed
> sales that would have resulted in a higher normal value
> and, accordingly, a higher dumping margin. SQR at 1-4.
> Accordingly, it was reasonable for Commerce to reject
> the established rates and instead select a rate which
> accounted for this conduct along with a "built-in
> increase" for deterrence purposes.

*Koehler I*, 7 F. Supp. 3d at 1316 (JA 13).

Koehler contends that, in addition to the investigation and first review, the

company also had dumping margins of 4.33 percent in the second review ("AR2"),

and zero margins in the fourth and fifth reviews, which further "discredit" the

petition rate. *Koehler Br.* at 26-28. The 4.33 percent AR2 margin, however, has

been invalidated; it was obtained through the same type of fraud that Koehler

committed in the instant third review. As Koehler acknowledges, its AR2 margin

has since been revised to 75.36 percent. *See id.* at 27. Koehler also overlooks the

fact that the fourth and fifth reviews took place <u>after</u> the third review that is the

subject of this appeal. Commerce could not have considered them in reaching the

challenged determination, and thus they may not be considered by a reviewing

Court. "Judicial review of antidumping duty administrative proceedings is

normally limited to the record before the agency in the particular review

proceeding at issue and does not extend to subsequent proceedings." *Koehler I*, 7

F. Supp. 3d at n. 8, quoting *QVD Food Co. v. United States*, 658 F.3d 1318, 1324-25 (Fed. Cir. 2011) (JA 14). *See also* 19 U.S.C. § 1516a(b)(2). Even if those latter reviews had been considered, however, they add nothing new. They do not "discredit" the petition rate any more than the investigation and first review margins calculated when Koehler had been cooperative.

Koehler claims that if Commerce had (1) accepted the home market sales fraudulently omitted from the initial questionnaire response, and (2) revised its methodology to accept certain rebates, its rate in the instant third review "would have been only 2.71 percent." *Koehler Br.* at 28. There is, however, no record evidence to support this assertion, because Commerce rejected Koehler's untimely attempt to provide the omitted sales after the transshipment scheme was revealed. *See* Rejection of Factual Information Submission (July 5, 2012) (JA 1364). The Trade Court refused to consider Koehler's representations regarding what its calculated rate would have been absent the fraud. *Koehler I*, 7 F. Supp. 3d at 1318, n.9 (JA 15). Koehler makes no argument that the Trade Court erred in so doing, and there is no reason why this Appeals Court should consider information cited by Koehler that is not part of the administrative record. In any event, as this Court has recently stated, "the point of corroboration is to ensure than an adverse rate is relevant and probative, not to assign a rate to an uncooperative respondent as if it had cooperated." *Ad Hoc Shrimp III*, 2015 U.S. App. LEXIS 17449 at *54-55.

18

Alternatively, Koehler argues that the petition cannot be used because the 75.36 percent rate was calculated using information derived – at least in part – from another company's experience. *Koehler. Br*. at 24-25. This argument is meritless. Again, the statute specifically provides for the use of petition rates as AFA, 19 U.S.C. § 1677e(b)(1) (2013), and "there is nothing in the statute or regulations that requires this type of company-specific analysis in applying an AFA rate." *IDM* at 20 (JA 1949). To the contrary, the statutory scheme expressly contemplates that "secondary information" – rather than the respondent's own data – may be used to determine the AFA rate. The petition is, of necessity, comprised of "secondary information," and it need not be based exclusively on information specific to the foreign producer. Indeed, it is contemplated that cost elements in the petition may be based on the experience of other companies such as the U.S. producers themselves. *See* 19 C.F.R. § 351.202(b)(7)(i)(B). The secondary information in the petition rate still has to be corroborated pursuant to 19 U.S.C. § 1677e(c). It is through the corroboration analysis that the petition rate is demonstrated to be reliable and relevant to Koehler. In this case, as explained in **subpart B** below, the 75.36 petition rate has been corroborated. There is no further requirement.

In this regard, Commerce routinely uses the margin calculated for one exporter as the AFA rate for a different exporter (where it can be corroborated),

19

and this practice has been repeatedly upheld by the Courts. *See, e.g., PAM, S.p.A. v. United States*, 582 F.3d 1336, 1338-40 (Fed. Cir. 2009) (upholding the use of a prior margin calculated for Barilla as the AFA rate for PAM). Similarly, this Court upheld the application of a 112.81% petition rate to respondent Hilltop in the *Ad Hoc Shrimp* litigation. *Ad Hoc Shrimp III*, 2015 U.S. App. LEXIS 17449 at *50. That petition rate was not calculated using any information pertaining specifically to Hilltop,[1] yet it was found to be corroborated (and thus relevant to Hilltop) by other information. *Id*. Because the 75.36% petition rate has been corroborated, it is "relevant" to Koehler and thus usable as the AFA rate pursuant to 19 U.S.C. § 1677e(b)(1).

## B.    The Petition Rate Is Corroborated

The 75.36 percent petition rate is relevant to Koehler because it "fell within the range of transaction-specific margins calculated for Koehler in AR2, the highest of which was 144.63 percent." *IDM* at 19 (JA 1948). Commerce found that this transaction-specific margin calculation from the previous review period "is relevant for purposes of corroboration because it is Koehler's own data and thus

---

[1]    In *Ad Hoc Shrimp*, the 112.81% petition rate was calculated by comparing publicly available U.S. import statistics with a normal value based on the petitioner's own factors of production. *See Certain Frozen and Canned Warmwater Shrimp from Brazil, Ecuador, India, Thailand, the People's Republic of China, and the Socialist Republic of Vietnam,* 69 Fed. Reg. 3876, 3880 (Dep't of Commerce Jan. 27, 2004) (Notice of Initiation).

Confidential Material Subject To Protective Order Deleted

reflective of its commercial practices in regard to this proceeding." *Id*.   Moreover,

Commerce's "corroboration exercise was conservative," because in AR2 (as in this

AR3), Koehler concealed sales that would have generated the highest dumping

margins. *Id*. at 19-20 (JA 1948-49).   It was reasonable, therefore, for Commerce to

infer that Koehler's actual AR2 margins would have been even higher than those

used in its corroboration analysis – potentially including additional sales that, if

reported, would have had margins exceeding the 75.36 percent petition rate. *Id*.

*See also Koehler I*, 7 F. Supp. 3d at 1317 (JA 14).

### 1.    Commerce's finding that the relevant sale is not aberrational is supported by substantial evidence

Koehler argues the sale with a 144.36 percent margin cannot be used for

corroboration purposes because it is "aberrational." *Koehler Br*. at 33-35.   As

support for that assertion, Koehler observes that this margin is significantly higher

than the second-highest margin of [          ]. *Id*. at 34-36.   Even when the highest

transaction-specific rate is greater than any other rate "by a wide margin,"

however, it does not "automatically render the rate aberrational." *PSC VSMPO-

AVISMA Corp. v. United States*, 755 F. Supp. 2d 1330, 1338 and n.10 (Ct. Int'l

Trade 2011), *aff'd*, 498 Fed. App'x 995 (Fed. Cir. 2013).   Sales can, on occasion,

be dumped at very high rates.   But unless they are shown to be "irregular" in some

other respect, they are not "aberrational." *Id*.   Koehler has made no such showing;

it points to nothing extraordinary about the product or terms of sale involved in this

transaction.

Koehler claims that this sale involved just a "single jumbo roll of paper" and comprised a "tiny fraction" of total reported sales. *Koehler Br.* at 35-36. But Koehler does not argue that this quantity is unusual. Nor could it, as there were many other sales with similar quantities during both AR2 and AR3. *See* Appvion's Response In Opposition To Plaintiff's Motion For Judgment On The Agency Record (April 23, 2014) at 39, n.7 (JA 2071). Although this sale, by itself, represents a very small percentage of Koehler's overall database, the same could be said of any individual transaction. A transaction-specific margin is not "aberrational" simply because a respondent claims "it is based on too small a percentage of {its} total sales." *Nan Ya Plastics Corp. v. United States*, 6 F. Supp. 3d 1362, 1369 (Ct. Int'l Trade 2014).

### 2. Commerce reasonably corroborated the petition rate using Koehler's highest transaction-specific margin from AR2

Koehler's primary critique of Commerce's corroboration analysis is that there exists only a single AR2 transaction-specific margin exceeding the petition rate. *Koehler Br.* at 33-37. Given the circumstances of Koehler's fraud, however, this argument must be greatly discounted. The reason why there were not more AR2 transaction-specific margins exceeding the 75.36 percent petition rate was because of Koehler's own misconduct. Again, Koehler fraudulently concealed its AR2 sales that would have generated the highest dumping margins. *IDM* at 19-20

(JA 1948-49).  Consequently, "it was reasonable for Commerce to conclude that the actual AR2 margins exceeded those which Commerce calculated using the data Koehler provided."  *Koehler I*, 7 F. 7 F. Supp. 3d at 1317 (JA 14).  For Koehler to complain now that there was only a single sale above 75.36 percent is a bit like the embezzler who, after shredding his company's books, points to the paucity of accounting documentation of his activities.  As Commerce found, "{t}he fact that Koehler, even after concealing its highest-priced matching sales, still had a second review margin exceeding the 75.36% petition rate is highly significant, and demonstrates that the petition rate is relevant to Koehler's actual experience."  *IDM* at 20 (JA 1949).  Under the unique circumstances of this case, therefore, it was reasonable for Commerce to place great weight on this transaction, even if it was only a "single sale," when corroborating the petition rate.  This sale demonstrates that the 75.36 percent petition rate is relevant to Koehler's actual commercial experience.

As Commerce explained, it is permissible in this context to use data that is reflective of a small portion of a respondent's actual sales, including data representing a "single sale."  *IDM* at 20 (JA 1949), citing *PAM,* 582 F.3d at 1340 and *Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1339 (Fed. Cir. 2002).  *See also Nan Ya*, 6 F. Supp. 3d at 1365 (upholding a 74.34% AFA rate based on respondent's "highest transaction-specific margin").

23

According to Koehler, the Courts have found in other cases that corroboration using only a small quantity of sales is insufficient. *Koehler Br.* at 32-37, citing *Dongguan Sunrise Furniture Co. v. United States*, 931 F. Supp. 2d 1346 (Ct. Int'l Trade 2013), *Lifestyle Enter., Inc. v. United States*, 768 F. Supp. 2d 1286 (Ct. Int'l Trade 2011) ("*Lifestyle I*"), and *Gallant Ocean*. Those cases are distinguishable, however, and they do not undermine Commerce's corroboration analysis here. As an initial matter, none of those cases involved a respondent that had intentionally concealed its highest-margin sales. Gallant Ocean was not even aware that it was required a file a questionnaire response, and there was no evidence that it withheld information for strategic reasons. *See* Appvion's Rebuttal Comments (May 13, 2014) at 30 (JA 2291); *Certain Frozen Warmwater Shrimp from Thailand*, 72 Fed. Reg. 52065 (Dep't of Commerce Sept. 12, 2007) (final results) at Comment 5. Similarly, in *Lifestyle I*, a respondent did not participate in the review, but there was no evidence of deception. *Lifestyle I*, 768 F. Supp. 2d at 1293. In *Dongguan Sunrise*, respondent Fairmont participated as a mandatory respondent and failed to report a certain number of its U.S. sales, but the Court found that "there is no evidence indicating that Fairmont failed to report the unreported sales in an attempt to hide sales with high margins." *Dongguan Sunrise Furniture Co. v. United States,* 997 F. Supp. 2d 1330, 1336 (Ct. Int'l Trade 2014). ("There is no indication that Fairmont failed to report certain sales for strategic

reasons." "Rather, the scope of the antidumping order was misunderstood by
Fairmont, or its employees were not properly instructed in how to identify in-scope
sales"). *Id.* at 1337.

Commerce is entitled to draw "a common sense inference" about a
respondent's likely margin from the circumstances of its non-cooperation. *Dongtai
Peak Honey Indus. Co. v. United States*, 777 F.3d 1343, 1356 (Fed. Cir. 2015).
For example, Commerce may assign the highest prior margin under circumstances
where, if the uncooperative respondent's rate had been lower, it "would have
produced current information showing the margin to be less." *Id.*, quoting *KYD,
Inc. v. United States*, 607 F.3d 760,766-77 (Fed. Cir. 2010) ("Commerce's
selection of the highest prior margin as the AFA rate reflects a common sense
inference that the highest prior margin is the most probative evidence of current
margins because, if it were not so, the responding party knowing of the rule, would
have produced current information showing the margin to be less"). The cases
cited by Koehler also held, however, that it may be unreasonable to infer a high
margin – based on a very small quantity of reported sales – where there is no
evidence that the non-cooperation was driven by such strategic considerations.
*Dongguan Sunrise* found no reason to conclude that sales omitted accidentally (or
through negligence) would have had significantly higher margins than the reported
sales. *Dongguan Sunrise,* 997 F. Supp. 2d at 1336-37. But the Court recognized

that its reasoning would not extend to instances of intentional concealment:

> Commerce expresses a concern that selecting a lower rate based upon a greater portion of the available data would entice respondents to game the system by declining to report transactions with high dumping margins with the expectation that the ultimate AFA rate will be lower than the rate they otherwise would have received. That concern might in fact justify a relatively greater increase in the rate in order to ensure compliance in other cases, but that justification does not appear to apply in this case because there is no evidence that Fairmont engaged in such strategic behavior.

*Id.* at 1337.

Here, unlike in the cases cited by Appellant, Koehler did "game the system" by intentionally concealing sales that would have generated the highest dumping margins. Indeed, Koehler engaged in an elaborate and fraudulent transshipment scheme in order to do so. It is entirely reasonable, under these circumstances, to infer that Koehler engaged in this behavior *because* it was concealing a high rate of dumping. Companies presumably would not take the risks associated with committing fraud unless doing so would generate a very large payoff or avoid a very large liability. In the context of this case, therefore, it was reasonable for Commerce to corroborate using only a single sale, even if it might not have been reasonable to do so under the circumstances presented in *Gallant Ocean*, *Lifestyle I*, or *Dongguan Sunrise*.

This case is also distinguishable from *Gallant Ocean* and *Lifestyle I* in

another important respect. Those cases involved the situation where Commerce

attempted to corroborate an AFA rate, for application against an uncooperative

respondent, using transaction-specific margins calculated for *different* exporters.

*Gallant Ocean*, 602 F.3d at 1322; *Lifestyle I*, 768 F. Supp. 2d at 1299. This case

presents no similar problems of relevancy, because the transaction-specific margin

here was calculated using Koehler's own sales information from the most recent

prior review. *IDM* at 19 (JA 1948). As the Court explained in *Koehler I*,

"Commerce tied the petition rate to Koehler's commercial reality using Koehler's

actual sales data," whereas in *Gallant Ocean* "Commerce failed to connect

Gallant's commercial reality to a small amount of data sourced from other

respondents during a different proceeding." *Koehler I*, 7 F. Supp. 3d at 1317 (JA

14).

Finally, this case is different from the cases cited by Koehler with respect to

the amount of "independent sources" available to Commerce. The statute requires

that agencies corroborate secondary information, "to the extent practicable," using

"information from independent sources that are reasonably at their disposal." 19

U.S.C. § 1677e(c) (2013). *See also Essar Steel Ltd. v. United States*, 753 F.3d

1368, 1374 (Fed. Cir. 2014). The Trade Court has recognized that Commerce has

considerably more discretion to use petition rates as total AFA in cases where the

"information from independent sources" is limited. In *Hubscher Ribbon Corp. v.*

27

*United States*, the Court stated:

> Commerce's discretion to use a petition rate as total AFA
> narrows considerably when the record and "independent
> sources" of information present numerous calculated
> rates among various respondents, potentially better
> informing the "commercial reality" or "actual rate" of a
> non-cooperative party.  That was the case in *Gallant
> Ocean*, where dozens of voluntary respondents had
> received calculated rates that in turn informed the Federal
> Circuit's analysis of the reasonableness of Commerce's
> use of a petition rate as AFA.  *Gallant Ocean*, 602 F.3d
> at 1323-24.  Here, in the investigation and first review,
> there were no voluntary respondents, and only one
> calculated rate for a mandatory respondent.

979 F. Supp. 2d 1360, 1369 (Ct. Int'l Trade 2014).  The Court recognized that

Commerce's discretion to use a high petition rate is much greater in cases where

the available information is more limited.  *Id.*  Here, as in *Hubscher*, there is only a

single respondent, *i.e.*, Koehler, for which an individual margin has ever been

calculated.  The body of available information is extremely limited – in part

because, as explained above, Koehler fraudulently concealed any sales that would

have generated high margins.  The Court stated in *Hubscher* that although

"Commerce's corroboration may be less than ideal because the uncooperative acts

of the respondent has deprived Commerce of the very information that it needs to

link an AFA rate to respondent's commercial reality… , Congress understood this

type of information shortfall might occur when it included the proviso, 'to the

extent practicable,' within Commerce's corroboration requirement."  *Id.* (finding

28

that a 247.65 percent petition rate was sufficiently corroborated).

The Trade Court recognized that Koehler's situation is much more like

*Hubscher* than *Gallant Ocean*:

> as a result of Koehler's conduct, the record lacked data
> essential to establishing Koehler's commercial reality.
> This Court has recognized that corroboration may be
> "less than ideal" where the sole respondent in a
> proceeding fails to cooperate "because the uncooperative
> acts of the respondent has deprived Commerce of the
> very information that it needs to link an AFA rate to
> respondent's commercial reality." *Hubscher*, 38 CIT at ,
> 979 F. Supp. 2d at 1369 (quoting *Qingdao Taifa Group
> Co. v. United States*, 35 CIT , , 780 F. Supp. 2d 1342,
> 1349 (2011)). This was certainly the case here: Koehler
> was the sole respondent and omitted sales data necessary
> to determine its commercial reality. SQR at 1-4. In
> contrast, Commerce had established rates for "over a
> dozen" mandatory respondents in *Gallant Ocean. See
> Gallant Ocean*, 602 F.3d at 1324.

*Koehler I*, 7 F. Supp. 3d at 1317 (JA 14). Koehler fails even to cite *Hubscher* in its

brief, let alone explain why the Trade Court's analysis was incorrect.

### 3.    The corroboration analysis does not rely on data that Commerce found to be unreliable

Koehler argues that it was unreasonable for Commerce to consider the

highest transaction-specific margin from AR2 in its April 2013 *Final Results*,

because it was later discovered that Koehler also had fraudulently omitted sales in

AR2, and, in June 2014, Commerce re-opened the AR2 record and applied total

AFA in that review. *Koehler Br*. at 38, citing Final Remand Redetermination

Pursuant to Court Remand, *Papierfabrik August Koehler AG v. United States*,

Consol. Court No. 12-00091 at 23 (CIT June 16, 2014) (ECF 76-1).  According to

Koehler, because Commerce ultimately rejected the AR2 sales data in the later

remand proceeding, it was unreasonable to rely upon those same AR2 sales data in

the AR3 corroboration analysis performed in the April 2013 *Final Results.*

*Koehler Br.* at 39.

      This argument lacks merit for two reasons.  First, as the Trade Court

explained, "the remand results of AR2 are not on the record of AR3," and "judicial

review is normally limited to the record before the agency in the particular review

proceeding at issue and does not extend to subsequent proceedings."  *Koehler I*,  7

F. Supp. at 1316, n. 8 (quoting *QVD*, 658 F.3d at 1324–25) (JA 13).  *See also* 19

U.S.C. § 1516a(b)(2).  "{J}udicial review of antidumping proceedings is based on

information before the relevant decision-maker at the time the decision was

rendered," and it is "improper for the Court of International Trade to consider

Commerce's actions in {a} subsequent antidumping proceeding."  *QVD,* 658 F.3d

at 1325 (internal citations omitted).  Koehler argues that the Trade Court could

have taken "judicial notice" of the subsequent developments in the AR2

proceeding.  *Koehler Br*. at n.7.  Koehler fails to explain, however, why – in light

of these precedents – it was an abuse of discretion not to do so.

      Second, as the Trade Court also explained, the subsequent developments in

the AR2 case do not undermine the AR3 corroboration analysis. According to the Trade Court, "that Commerce found Koehler's data to be unreliable for the purpose of calculating a weighted average dumping margin does not affect its use of transaction-specific margins from that data for the separate purpose of corroborating an AFA rate." *Koehler I*, 7 F. Supp. at 1316, n. 8 (JA 13). *See also Koehler II*, 44 F. Supp. 3d at 1358 ("Commerce may use transaction-specific margins from data found unreliable for the purpose of calculating a weighted average dumping margin in order to corroborate an AFA rate") (JA 17).

This is perfectly logical. Koehler's AR2 questionnaire responses could not be used to calculate a weighted-average margin, because Koehler concealed its "highest-priced home market sales" that would have generated the highest rates. *IDM* at 19-20 (JA 1948-49); *Koehler I*, 7 F. Supp. 3d at 1317 (JA 14). As a consequence, the questionnaire responses are incomplete, and any weighted-average margin calculated therefrom would be "artificially low." *Koehler I,* 7 F. Supp. 3d at 1317 (JA 14). But in this unique situation, it is perfectly reasonable – and conservative – to rely (for corroboration purposes) on the highest margin sale that was reported. The fact that, even after Koehler concealed its highest-margin transactions, a sale remained in the database with a margin of 144.63 percent makes it highly probative of Koehler's actual commercial experience, and it shows that there likely would have been other sales with margins exceeding the petition

31

Confidential Material Subject To Protective Order Deleted

rate had the company not fraudulently concealed them. *IDM* at 19-20 (JA 1948-49). As the Trade Court recognized, it is reasonable to infer that Koehler's "actual AR2 margins exceeded those which Commerce calculated using the data Koehler provided" during AR2. *Koehler 1*, 7 F. Supp. at 1317 (JA 14). In any event, Plaintiff-Appellant is hardly in a position to complain about the reliability of this transaction, because Koehler itself reported the sale.

> **4.    Even if Commerce erred in relying on Koehler's highest transaction-specific margin, such error was harmless, and no remand should be ordered**

Even if this Court finds that Commerce erred in relying on the highest transaction-specific margin from AR2, such error was harmless, and the Petition rate should still be found to be corroborated. This is so for two reasons.

First, Koehler makes no argument that its other high margin sales, including one sale with a margin of [      ] percent and [   ] other sales with margins between [        ] percent, were aberrational. *Koehler Br.* at 34. Those margins were based solely on the sales that Koehler deigned to report during AR2, without even considering the many still higher margins that would have been calculated had Koehler not concealed its "highest-priced home market sales." *See Koehler I*, 7 F. Supp. 3d at 1317 (JA 14). As this Appeals Court has explained, an AFA rate should include a "built-in increase intended as a deterrent to non-compliance." *De Cecco*, 216 F.3d at 1032. The degree of deterrence needed in any particular case

depends, of course, on the nature of the respondent's non-cooperation.  For cases

such as this one involving a pre-planned and intentional fraud, particularly by a

sophisticated and experienced respondent such as Koehler,[2] the need for deterrence

is at its zenith.  The AFA rate must be sufficiently high to convince a respondent

contemplating fraud that, even if the chances of getting caught are low, the

consequences are sufficiently severe that it is not worth the risk.  In other words, an

AFA rate, in order to be effective in cases of fraud, must include a very

considerable "built-in increase intended as a deterrent to non-compliance." *De*

*Cecco*, 216 F.3d at 1032.

Here, regardless of the sale with a 144.63 percent margin, "Commerce

properly determined that the petition rate was a reasonably accurate estimate of

Koehler's commercial reality with a 'built-in increase' for deterrence purposes."

*Koehler I*, 7 F. Supp. 3d at 1318 (JA 15).  Commerce selected a rate that (1) is

sufficiently adverse "as to effectuate the statutory purposes of the adverse facts

available rule to induce respondents to provide the Department with complete and

accurate information in a timely manner," and (2) "ensures that the party does not

---

[2]     As explained in the *Final Results*, Koehler had already been a
mandatory respondent in the investigation and two administrative reviews, and
Koehler personnel were well aware that "a sale must be reported as a home market
sale, even though it is physically shipped to a location outside the home market, if,
at the time of sale, the manufacturer knew that the product was ultimately destined
for its home market." *IDM* at 10 (JA 1939).

obtain a more favorable result by failing to cooperate than if it had cooperated

fully." *IDM* at 21 (JA 1950).  The 75.36 percent AFA rate was necessary, in light

of Koehler's behavior, to further these policy goals, and it fully complies with this

Court's guidance in *De Cecco*.  Commerce appropriately found that the alternative

(much lower) rates proposed by Koehler "cannot be considered sufficiently

adverse to serve as a deterrent to prevent Koehler from submitting fraudulent

questionnaire responses in the future." *IDM* at 21-22 (JA 1950-51).

Second, even if this Court finds that the 75.36 petition rate is uncorroborated

because it does not reflect some supposed "commercial reality," no purpose would

be served by ordering a remand.  On June 29, 2015, President Obama signed into

law the Trade Preferences Extension Act of 2015 ("TPEA"), which amended 19

U.S.C. § 1677e.  Pub. L. No. 114-27, § 502, 129 Stat. 362, 383-84.  The statute

now specifies that, in the corroboration context, Commerce need not estimate what

a respondent's margin would have been had it cooperated or demonstrate that the

selected AFA rate reflects an alleged "commercial reality." *See* 19 U.S.C. §

1677e(d)(3) (2015).  This Court held that section 502 of the TPEA (regarding

corroboration) applies "only to Commerce determinations made on or after the date

of enactment." *Ad Hoc Shrimp III*, 2015 U.S. App. LEXIS 17449 at *24. *See also*

*Dates of Application of Amendments to the Antidumping and Countervailing Duty*

*Laws Made by the Trade Preferences Extension Act of 2015*, 80 Fed. Reg. 46793,

46794 (Dep't of Commerce Aug. 6, 2015).  The TPEA was not in effect at the time

Commerce issued the *Final Results*, and thus it was not applied in the

determination currently on review.  If this Court were to order a remand, however,

any redetermination by Commerce would be a "determination" subject to the

TPEA.  In supplemental briefing before this Court in *Ad Hoc Shrimp III*, the

United States stated: "If the Court were to re-open the proceeding with respect to

the matters on appeal by remanding the case back to Commerce for a new adverse

facts available determination, it would appear appropriate for the agency to apply

the standards enacted by section 502 in making a new determination following the

new law's enactment."  Supplemental Brief of the United States at 7, *Ad Hoc

Shrimp Trade Action Comm. v. United States*, No. 2014-1514 (Fed. Cir. Aug. 27,

2015).  Under this view, the TPEA would govern any redetermination in this

proceeding, meaning that issues regarding "commercial reality" would become

moot.  No purpose would be served, therefore, by remanding for Commerce's

further consideration of corroboration issues pertaining to Koehler's alleged

"commercial reality."

### C.    The Petition Rate Is Not "Punitive"

Koehler argues that the 75.36 percent petition rate is impermissibly

"punitive."  *Koehler Br*. at 39-42.  As support for this proposition, Koehler points

to the fact that this rate "is over eleven times higher than the highest calculated rate

imposed on Koehler in any prior review." *Id.* at 40. As Commerce explained, however, the AFA rate applied when the respondent commits fraud is <u>supposed</u> to be significantly higher than prior rates calculated when that respondent was cooperative, in order to deter noncompliance. *IDM* at 21 (JA 1950). As Commerce also observed, in other cases this Court upheld AFA rates that were far more than eleven times higher than cooperative rates. *Id.* Indeed, in *KYD*, this Court upheld a 122.88 percent AFA margin that was more than 65 times the highest rate calculated for a cooperative exporter. *Id.*, citing *KYD*, 607 F.3d 760. *See also Ad Hoc Shrimp III*, 2015 U.S. App. LEXIS 17449 at *52 (rejecting respondent Hilltop's argument that the 112.81% petition margin was "punitively high" where it was "over twelve times higher than the highest rate ever calculated for a cooperative respondent") and at *53 ("this court has clarified that AFA rates can be significantly higher than rates calculated for cooperating respondents").

*KYD* holds that an AFA dumping margin that otherwise complies with all statutory requirements "is not a punitive measure." *KYD*, 607 F.3d at 768. *See also IDM* at 21 (JA 1950). Because the petition rate has been corroborated and complies with the requirements of 19 U.S.C. § 1677e for the reasons set forth above, it is not "punitive." *See Koehler I*, 7 F. Supp. 3d at 1318 (JA 15).

Koehler cites *Dongguan Sunrise* for the proposition that an AFA rate "many times higher than the weighted-average margin for the reported sales … indicates

that the deterrence factor applied is far beyond the amount necessary to deter future non-compliance." *Koehler Br*. at 40. In *Dongguan Sunrise*, however, the AFA rate was found to be uncorroborated, not punitive. Moreover, the reason why the Court found the deterrence factor was too high in *Dongguan Sunrise* was because there was no intentional misconduct to deter. The Court recognized that a much higher AFA rate would be justified to deter intentional concealment of high margin sales. *Dongguan Sunrise*, 997 F. Supp. 2d at 1337 ("Commerce's attempts to justify the partial AFA rates by invoking the need for deterrence is unavailing. Commerce expresses a concern that selecting a lower rate based upon a greater portion of the available data would entice respondents to game the system by declining to report transactions with high dumping margins with the expectation that the ultimate AFA rate will be lower than the rate they otherwise would have received. That concern might in fact justify a relatively greater increase in the rate in order to ensure compliance in other cases, but that justification does not appear to apply in this case because there is no evidence that Fairmont engaged in such strategic behavior"). In this case, Koehler – unlike the respondent in *Dongguan Sunrise* – intentionally concealed its high margin sales. The need for deterrence, therefore, is at its greatest. The 75.36 percent petition rate serves a remedial purpose in this case; it is not "punitive."

## III.    COMMERCE'S REJECTION OF KOEHLER'S "REVISED" SALES DATA WAS IN ACCORDANCE WITH LAW

As explained in the *Final Results*, Koehler fraudulently omitted certain home market sales from its initial questionnaire responses dated February 27, 2012.  *IDM* at 2 (JA 1932).  The "scheme was revealed by the petitioner in a May 18, 2012, letter."  *Id.*  In its June 27, 2012 supplemental questionnaire response, Koehler acknowledged the scheme and attempted to provide a new home market sales listing that included the previously concealed sales.  *Id.*  Commerce, however, rejected the new home market sales listing because it included unsolicited and untimely new information.  *Id.*

Koehler argues that, notwithstanding its fraud, Commerce was required to accept and use the revised sales listing (with the previously concealed sales) to calculate a dumping margin.  *Koehler Br.* at 42-56.  According to Koehler, Commerce's rejection of the information violated (1) 19 U.S.C. § 1677m(d), *id.* at 43-47, (2) 19 U.S.C. § 1677m(e), *id.* at 47-53, and (3) the overarching statutory goal of "promoting accuracy."  *Id.* at 53-56.  All of these arguments are wrong, for the reasons discussed in **subparts A-C** below.  But even if these arguments were correct, and Commerce was required to accept Koehler's revised sales listing onto the record, it would not have made a difference to the ultimate result for the reasons explained in **subpart D** below.  There is no reason to remand this case for further proceedings.

38

### A.    Commerce's Decision Complied With 19 U.S.C. § 1677m(d)

Koehler argues that Commerce, in rejecting the "revised" sales response, failed to comply with the requirements of 19 U.S.C. § 1677m(d), which requires Commerce to "promptly inform" respondents "of the nature of the deficiency" and "provide the person with an opportunity to remedy or explain the deficiency." *Koehler Br*. at 43. Commerce's obligations under 19 U.S.C. § 1677m(d) are "not triggered," however, "unless the respondent has met all of the five enumerated criteria of section 1677m(e)." *Koehler I*, 7 F. Supp. 3d at 1312 (JA 11), quoting *Tung Mung Dev. Co. v. United States*, 25 CIT 752, 789 (2001). *See also IDM* at 11 (JA 1940) (also quoting *Tung Mung*). For the reasons explained at **subpart B** below, Koehler failed to satisfy all of the criteria of 19 U.SC. § 1677m(e), and thus Commerce was not constrained by 19 U.S.C. § 1677m(d).

Regardless, Commerce clearly complied with any obligations imposed by 19 U.S.C. § 1677m(d). Koehler argues that this provision allows every respondent at least one opportunity to revise its response, without exception, "regardless of the basis for the deficiency." *Koehler Br*. at 43. That is, even where a respondent provides an intentionally falsified questionnaire response, Koehler's argument is that 19 U.S.C. § 1677m(d) obliges Commerce – if it discovers the fraud – to provide the respondent with an opportunity to "remedy" the "deficiency." That is incorrect. Commerce reasonably concluded that 19 U.S.C. § 1677m(d) did not

require acceptance of Koehler's previously concealed sales.

The statute requires Commerce to "inform" respondents of "deficiencies." 19 U.S.C. § 1677m(d).  This presupposes that "deficiencies" are the types of errors or omissions of which a respondent would not be aware.  A *fraudulent* response is materially different from such a "deficient" response, because the submitter already is well aware of any misstatements or omissions and would have no need to be "informed" of them.  As Commerce explained,

> We must emphasize that the "deficiency" at issue did not come about because Koehler inadvertently omitted a number of sales from its questionnaire response as a result of an unintentional oversight in compiling the information.  The "deficiency" did not arise due to an unintentional computer programming error that generated an incomplete home market sales database.  The "deficiency" did not occur because of a misunderstanding of the Department's questionnaire instructions.  The "deficiency" in Koehler's questionnaire responses occurred because <u>Koehler intended to submit deficient, incomplete, and fraudulent questionnaire responses to the Department</u>.

*IDM* at 9 (JA 1938) (emphasis added).  Commerce also stated that Koehler's suggestion "that the burden to uncover the 'deficiency' and to request its correction falls on the Department … obscures Koehler's responsibility, in the first instance, to provide complete and accurate information to the best of its ability."  *Id*. at 10 (JA 1939).

Because the concealment of sales was intentional, Koehler was already

40

aware of the "deficiency." As Commerce explained, "Koehler did not need the Department to 'promptly inform {it} of the nature of the deficiency.'" *Id*. at 11 (JA 1940). Indeed, Koehler had been aware of the "deficiency" for a very long time, and it had numerous prior opportunities to correct its responses. Koehler had known about the problem "from the time it embarked on the transshipment scheme during AR2." *Id*. at 10 (JA 1939). Koehler "intentionally provided incomplete and inaccurate information in response to the Department's detailed and very specific AR2 questionnaire," and "Koehler continued to misrepresent its home market sales reporting in response to the Department's AR2 supplemental questionnaires that included specific questions concerning home market sales." *Id*. Koehler then continued in the instant third review to knowingly conceal home market sales in its February 21, 2012 Section A Questionnaire Response (at Exhibit A-1 quantity and value chart) (JA 104) and again in its February 27, 2012 Section B Questionnaire Response (at Exhibit B-19 sales database) (JA 418-33). *IDM* at 11 (JA 1940). Koehler was thus well aware of the "deficiency" and already had had multiple opportunities to remedy its incomplete responses before the petitioner revealed the fraud on May 18, 2012.

It is reasonable for Commerce to construe the requirement of 19 U.S.C. § 1677m(d) to "promptly inform" a respondent of a "deficiency" as being inapplicable to situations where that respondent intentionally submitted a

41

fraudulent questionnaire response.  Koehler cites no precedent that would

undermine this construction.  In the cases cited by Koehler where a respondent was

permitted to correct its response, there was no finding that the respondent had

engaged in willful deception or fraud in its original submissions.  *See Koehler Br.*

at 44, citing *Timken*, 434 F.3d at 1347-53; *Agro Dutch Indus. Ltd. v. United States*,

31 CIT 2047, 2055 (2007).  As the Trade Court explained below, "although the

cases Koehler cites limit Commerce's discretion to reject untimely corrective

submissions prior to the final results stage, they are inapplicable here because they

do not involve a failure to cooperate…. Commerce's decision here was proper

given Koehler's failure to cooperate." *Koehler I*, 7 F. Supp. 3d at 1313 (JA 11).

The Trade Court has made clear that the statute should not be construed so

as to give respondents "an incentive to submit false information to Commerce in an

attempt to lower their margins without the fear of negative consequences." *Tianjin*

*Magnesium Int'l Co. v. United States*, 844 F. Supp. 2d 1342, 1348 (Ct. Int'l Trade

2012).  The Court specifically rejected any statutory construction, like Koehler's,

that "leaves respondents without any downside to submitting false information in

an attempt to lower their margins.  If Commerce does not detect the false

documents, a lower margin is obtained.  If Commerce does detect the falsehood,

such conduct is simply removed from consideration…" This Appeals Court

recognized in a similar context that Commerce need not allow a respondent to

report information that previously had been withheld, lest "Commerce runs the risk of gamesmanship." *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1276 (Fed. Cir. 2012).

As Commerce explained in the *Final Results*,

> To permit Koehler to submit its "corrected" home market sales database after its fraudulent conduct was revealed by the petitioner would create the situation described in *Tianjin Magnesium*, discussed above, which would allow respondents to submit misleading responses with impunity.  We agree with the petitioner's assessment that
>
> > {i}f respondents such as Koehler know that they will get a "free pass" to commit fraud in their initial questionnaire responses, secure in the knowledge that they will have an opportunity to "correct" the fraud should it be discovered, there would be no disincentive with respect to such behavior. Under such a framework, a rational respondent would always take its best shot to lower its margin through deception, concealment, and outright fraud in the initial questionnaire response.

*IDM* at 12 (JA 1941).  Commerce appropriately interprets 19 U.S.C. §1677m(d) as not creating a "free pass to commit fraud."

Even if 19 U.S.C. § 1677m(d) were construed to impose obligations on Commerce in cases of outright fraud by the respondent (which it should not be), its plain language requires only that Commerce allow a party to "remedy *or explain* the deficiency."  Commerce found that it "fulfilled its obligation" under this provision "by providing Koehler with the opportunity to explain its deficiency."

43

*IDM* at 11 (JA 1940).  *See also Koehler I*, 7 F. Supp. 3d. at 1312 (JA 11) (stating that "Commerce provided Koehler with an opportunity to explain the omissions from its initial questionnaire responses").  It is perfectly reasonable, particularly in fraud cases, to construe the disjunctive "remedy or explain" provision as being satisfied where the respondent has the opportunity to explain itself, even if Commerce does not also allow that respondent to "remedy" the fraud.  A contrary interpretation would encourage future misconduct by creating the "free pass" to commit fraud as discussed in *Tianjin Magnesium*.  The Trade Court has upheld this construction not just in *Koehler I*, but also in previous cases involving non-cooperative respondents.  *See Myland Indus., Ltd. v. United States*, 31 CIT 1696, 1704-05 (2007) (holding that 19 U.S.C. § 1677m(d) did not require Commerce to permit an uncooperative respondent to "remedy" its response after it had already been allowed to "explain" its deficiency).

Koehler argues that Commerce's interpretation of the statute is unreasonable, as it "would render the word 'remedy' in the statute meaningless because Commerce could always limit the respondent to only explaining why a deficiency occurred."  *Koehler Br*. at 46, n. 8.  According to Koehler, such a construction would not provide a sufficient check on Commerce's discretion.  *Id*. Koehler ignores the fact, however, that Commerce must act reasonably in exercising its discretion, and such exercise is subject to judicial review.  This Court

44

has found it to be an abuse of discretion, for example, not to allow fully

cooperative respondents to submit information to remedy data-entry errors. *See*

*Timken*, 434 F.3d at 1354, *NTN*, 74 F.3d at 1208. There was no similar "abuse of

discretion" in this case, where Koehler attempted to "remedy" a fraudulent

response. *See Koehler I*, 7 F. Supp. 3d at 1312-13 (JA 11-12). Koehler provides

no reason to conclude that the disjunctive phrase "remedy <u>or</u> explain" must be

construed as requiring Commerce, in every instance – including when presented

with fraudulent responses, to allow the respondent to both "remedy <u>and</u> explain."

Koehler argues at length that it would have been "practicable" for

Commerce to permit it to submit the previously concealed sales, because the fraud

was discovered relatively early in the review. *Koehler Br.* at 45-47. This

argument, however, entirely misses the point. The reason why Commerce did not

allow Koehler to "remedy" its response pursuant to 19 U.S.C. § 1677m(d) was not

because it would not have been "practicable" to do so given statutory deadlines.

Rather, it was for the three reasons addressed above, *i.e.*, that this provision (1) was

not triggered because Koehler's information submission failed to comply with the

requirements of 19 U.S.C. § 1677m(e), (2) applies only to "deficiencies" of which

the respondent is unaware, not to fraud such as that committed by Koehler, and (3)

even if it applies in cases of fraud, it was satisfied when Commerce allowed

Koehler to "explain," rather than "remedy," its response. *IDM* at 9-11 (JA 1938-

40).  Koehler presents no compelling arguments to undermine Commerce's

construction and application of 19 U.S.C. § 1677m(d) to the facts of this case.  For

all of these reasons, therefore, Commerce's decision fully complied with the

requirements of 19 U.S.C. § 1677m(d).

### B.    Commerce Correctly Determined That Koehler Failed To Meet The Requirements Of 19 U.S.C. § 1677m(e)

Koehler argues that Commerce, in not accepting its revised sales file, failed

to comply with 19 U.S.C. § 1677m(e), which states that Commerce "shall not

decline to consider information," so long as (1) "the information is submitted by

the deadline established for its submission," (2) "the information can be verified,"

(3) "the information is not so incomplete that it cannot serve as a reliable basis for

reaching the applicable determination," (4) the submitter "has demonstrated that it

acted to the best of its ability in providing the information and meeting the

requirements established by the administering authority," and (5) "the information

can be used without undue difficulties."  *Koehler Br.* at 48-53.

This provision did not require acceptance of Koehler's "revised" sales listing

with the previously concealed sales.  As Commerce appropriately found, the

submission was untimely, Koehler failed to act to the best of its ability to provide a

complete home market database, and the information provided could not be

verified.  *See IDM* at 12 (JA 1941).  Commerce could "decline to consider" the

information, therefore, pursuant to 19 U.S.C. § 1677m(e)(1), (2), or (4).  Even if

46

only one of Commerce's three findings were supported by substantial evidence, therefore, Koehler's argument must fail.

### 1. Koehler's "Revised" Sales Listing Was Untimely

Koehler intentionally omitted certain transshipped home market sales from its initial February 27, 2012 questionnaire response.  *IDM* at 2 (JA 1931).  On May 16, 2012, Commerce issued a supplemental questionnaire ("SQ") to Koehler with various questions about the response (JA 489-494).  This SQ did not solicit any previously unreported transshipments; Commerce was unaware of the fraud scheme at the time it issued that questionnaire.  Koehler's fraud was not revealed until May 18, 2012, when the Petitioner provided information from a confidential source detailing the scheme.  Petitioner's Submission of New Factual Information (May 18, 2012) (JA 927-37).  Nevertheless, when Koehler filed its response to Commerce's May 16 SQ on June 27, 2012, Koehler acknowledged the transshipment scheme and attempted to provide a new sales listing that included the previously omitted sales.  *IDM* at 2 (JA 1931).  On July 5, 2012, Commerce rejected this new home market sales database on the grounds that it constituted untimely filed new factual information that was unsolicited by the Department.  *Id*. On August 2, 2012, Koehler resubmitted the supplemental questionnaire response without the new database, in accordance with the Department's July 5, 2012, instructions.  *Id*.

Koehler argues that Commerce should have accepted the revised sales listing, because it was submitted on the June 27, 2012 deadline for the submission of its response to the SQ. *Koehler Br.* at 48-49. But that misses the point. The information *solicited* by Commerce's SQ may have been timely filed on June 27. The revised sales listing (including the previously concealed sales), however, was not solicited by Commerce. That new database was untimely because the transshipped sales should have been reported in Koehler's initial February 27 response. As Commerce explained in the *Final Results*,

> the SQ and the subsequent letters granting extension deadlines did not include instructions, implicit or otherwise, to submit the data for the home market sales at issue. In the SQ, the Department requested Koehler to "explain" and to "identify differences" concerning aspects of Koehler's questionnaire responses, but the Department did not request Koehler to revise its sales reporting methodology, nor did the Department instruct Koehler to report or include additional sales in the home market database. Moreover, Koehler's extension request did not identify its intent to file a revised home market sales database; rather, Koehler's request was based on its need to investigate and respond to the petitioner's allegations and to provide a complete and accurate response to the SQ. The Department's letter granting the extension due to Koehler's "unique circumstances" was by no means an open invitation for Koehler to submit any and all information beyond the scope of the SQ.

*IDM* at 8 (JA 1937). The Trade Court agreed that Commerce properly rejected as untimely Koehler's belated attempt to provide the transshipped sales with its supplemental response. *Koehler I*, 7 F. Supp. 3d at 1312 (JA 9). Koehler presents

48

no reason to reverse the Trade Court's decision.  Thus, Commerce appropriately

could "decline to consider" the response pursuant to 19 U.S.C. § 1677m(e)(1).

### 2.    Koehler Did Not Act To The Best Of Its Ability

Koehler claims that it acted to the best of its ability to provide the revised

sales listing with the transshipped sales.  *Koehler Br*. at 51-52.  Although Koehler

acknowledges that these sales were omitted from the original response, Koehler

claims that it provided the sales once "senior management learned about the

misreporting."  *Id*.  According to Koehler, "the failure to submit data in the first

response does not by definition mean that a company has not acted to the best of its

ability."  *Id*. at 52.  This argument is meritless.  Koehler did not simply "fail to

submit data."  Koehler *intentionally concealed* data.  *IDM* at 7-12 (JA 1936-41).

Because Koehler deliberately submitted incomplete and fraudulent information, it

necessarily did not act to the "best of its ability" to comply with Commerce's

request for information.  *See Nippon Steel Corp. v. United States*, 337 F.3d 1373,

1383 (Fed. Cir. 2003) ("intentional conduct, such as deliberate concealment or

inaccurate reporting, surely evinces a failure to cooperate").

Where a respondent fails to act to the best of its ability to provide

information in an initial questionnaire response, nothing in section 1677m(e)

requires that Commerce accept and use subsequently corrected data without

applying AFA pursuant to section 1677e.  *Gerber Food (Yunnan) Co. v. United*

*States*, 491 F. Supp. 2d 1326, 1336 (Ct. Int'l Trade 2007). "If the court were to so construe these related provisions, a participant in the administrative review would incur no adverse consequences for withholding requested information until the later stages of the questionnaire process, or for significantly impeding the review by repeatedly providing questionnaire responses with significant deficiencies, and thereby failing to act to the best of its ability in providing the information requested. The plain meaning of §§ 1677e and 1677m is to the contrary." *Id. See also Tianjin Magnesium,* 844 F. Supp. 2d at 1348. Thus, Commerce also could "decline to consider" the response pursuant to 19 U.S.C. § 1677m(e)(4).

### 3.    The Information Could Not Be Verified

Koehler spends several pages of its brief arguing that the revised sales listing could have been verified. *Koehler Br*. at 49-51. Koehler fails, however, to address the reason why its response was unverifiable. It was unverifiable because of the company's own fraud, which rendered its entire response "unreliable and unusable." *IDM* at 7-8 (JA 1936-37). As Commerce explained,

> we find that Koehler's questionnaire responses are unreliable and unusable in this review; therefore such information cannot be verified…. Although Koehler claims to have submitted all of its home market sales data that Koehler originally omitted in its first supplemental response (June 27 SQR), the Department cannot rely upon any of Koehler's submitted information to calculate an accurate dumping margin due to Koehler's material omission of this essential sales data and the facts surrounding how Koehler intentionally concealed its

Confidential Material Subject To Protective Order Deleted

> home market sales information until Petitioner's
> allegations were submitted on the record of this review.
> Where a respondent engages in conduct like Koehler's, it
> "calls into question the accuracy of all the information
> that it provided during the course of the review," and the
> Department's established practice is to treat the entire
> response as "unreliable."

*Preliminary AFA Memorandum* at 9-10 (JA 1722-23).

Commerce further explained that its "standard verification procedures were

not established to confirm the veracity of this type of sales information, which

would require extraordinary measures outside the scope of a typical sales

verification (*e.g*., third country sales verifications involving documented or

[                                                    ] and detailed forensic accounting

sales traces involving third country payment records of various customers).

Accordingly, due to the material misrepresentations made by Koehler regarding the

concealment of its home market sales data coupled with its certifications of the

accuracy of its original responses, we find that its responses are unreliable and

cannot be verified." *Id.* at 10 (JA 1732J).

Koehler argues that Commerce did, in fact, verify other transshipped sales in

the subsequent fourth review of this antidumping proceeding. *Koehler Br.* at 49.

But this is irrelevant. During AR4, Koehler did not conceal any sales. *See*

*Koehler I*, 7 F. Supp. 3d at 1312, n.7 (JA 11). The fact that Commerce conducted a

verification in AR4 (which had not even occurred at the time of the AR3 *Final*

*Results* now under review) thus has no bearing on this case.  Moreover, the other cases cited by Koehler, such as *NTN* and *Timken*, *see Koehler Br*. at 49, are similarly irrelevant because they did not involve fraudulent responses.

Thus, Commerce also could "decline to consider" the revised sales response pursuant to 19 U.S.C. § 1677m(e)(2).

### C.   Commerce Did Not "Abuse Its Discretion" In Rejecting Koehler's Untimely Submission

Koehler argues that Commerce "abused its discretion" by rejecting the untimely submission of its transshipped sales.  *Koehler Br*. at 53-56.  According to Koehler, Commerce is required to waive regulatory time limits "where failure to do so would amount to an abuse of discretion."  *Id*. at 53.  Koehler points to *NTN* and *Timken*, where this Court required Commerce to accept certain corrective data after the applicable deadlines.  *Id*. at 53-54, citing *NTN*, 74 F.3d 1204, and *Timken*, 434 F.3d 1345.  Once again, however, both *NTN* and *Timken* involved situations where the respondent sought to correct minor and inadvertent errors.  In *NTN*, an employee had made "typing errors" in transcribing certain information about reported U.S. sales.  *NTN*, 74 F.3d at 1207-08.  In *Timken*, the company had miscoded the channel designation for certain reported home market sales.  *Timken*, 434 F.3d at 1347-48.  The Appeals Court held that, under the unique circumstances of those cases, Commerce was obligated to accept information correcting such mistakes, even if they were discovered after the deadline for submitting new facts.

Those cases have no application to instances of fraud. Koehler cites no cases, and we are aware of none, where the Court found it an "abuse of discretion" for Commerce not to extend a deadline to enable a respondent to submit "corrective information" to remedy its own fraud. Such a policy would make no sense, as it would only encourage more fraud in the future. It would "leave{ } respondents without any downside to submitting false information in an attempt to lower their margins," *Tianjin Magnesium*, 844 F. Supp. 2d at 1348, because if the fraud were detected, Commerce would then be forced to exercise its discretion to allow untimely corrective submissions. Commerce reasonably concluded that it need not extend deadlines in order to provide respondents with a "'free pass' to commit fraud in their initial questionnaire responses." *IDM* at 12 (JA 1941).

Koehler argues that Commerce's interest in enforcing deadlines must be balanced against the interest in calculating dumping margins "as accurately as possible." *Koehler Br.* at 12, 53. Nevertheless, "a court cannot set aside application of a proper administrative procedure because it believes that properly excluded evidence would yield a more accurate result if the evidence were considered." *PSC VSMPO-AVISMA Corp. v. United States,* 688 F.3d 751, 761 (Fed. Cir. 2012); *Dongtai,* 777 F.3d at 1352 . "Without the ability to enforce full compliance with its questions, Commerce runs the risk of gamesmanship and lack of finality in its investigations." *Essar Steel*, 678 F.3d at 1276. Enforcement of

53

deadlines encourages compliance with Commerce's instructions and timely

provision of information, and it discourages "game playing" and non-cooperation.

If Commerce were compelled to accept unsolicited information in Koehler's June

27 supplemental response that should have been provided in the initial February 27

response, it would allow Koehler to game the system and withhold unfavorable

information (unless and until discovered by another party).  Commerce did not

abuse its discretion in refusing to allow Koehler to submit information that should

have been provided in the original questionnaire response.

In any event, it is absurd for Koehler to suggest that acceptance of its

untimely sales listing would have led to a more "accurate" result.  As Commerce

explained, the nature of the fraud "rendered Koehler's questionnaire responses

wholly unreliable and unusable."  *IDM* at 8 (JA 1937).  Commerce properly

concluded, therefore, that "granting Koehler additional time to submit its revised

home market sales data would not result in a response in which the Department

could rely on the veracity of the data."  *Id.*  Moreover, the goal of "accuracy" is

ultimately not well served by any policy that encourages respondents, like Koehler,

to submit false information.  *See Tianjin Magnesium,* 844 F. Supp. 2d at 1348.

The Department's enforcement of its regulatory deadlines in this review was

entirely reasonable, and it was not an "abuse of discretion" as claimed by Koehler.

**D.    Even If Rejection Of Koehler's "Revised" Home Market Sales Listing Were Improper, It Would Not Undermine The Basis For Applying Total Adverse Facts Available**

Ultimately, whether Koehler's June 27, 2012 submission of the previously concealed sales should have accepted or rejected from the administrative record does not affect the appropriateness of Commerce's decision to apply total AFA. Commerce did not resort to facts available because it was missing necessary information pursuant to 19 U.S.C. § 1677e(a)(1). It applied facts available because Koehler met at least one of the criteria set forth at 19 U.S.C. § 1677e(a)(2). *IDM* at 6-8 (JA 1935-37); *Preliminary Decision Memorandum* at 9-10 (JA 1707-08). That is, Koehler withheld information that had been requested, failed to provide information on a timely basis, significantly impeded the proceeding, and provided information that could not be verified. *Id*.

In particular, Commerce found that Koehler "withheld information" because it "deliberately concealed relevant home market sales, thus satisfying 19 U.S.C. § 1677e(a)(2)(A). *IDM* at 7 (JA 1936); *Preliminary Decision Memorandum* at 9 (JA 1707). Moreover, Koehler failed to provide home market sales information on a timely basis, thus satisfying 19 U.S.C. § 1677e(a)(2)(B). *Id*. Koehler also "significantly impeded" the review by creating and executing a "transshipment scheme in order to conceal home market sales," thus satisfying 19 U.S.C. § 1677e(a)(2)(C). *Id*. And the information provided by Koehler could not be

55

verified, because the company's misrepresentations rendered its entire response "unreliable and unusable," thus satisfying 19 U.S.C. § 1677e(a)(2)(D).  Any of these findings is sufficient to support the application of total AFA, regardless of whether the June 27, 2012 submission had been rejected from the record.  There is no reason, therefore, to remand this case for further proceedings.

## CONCLUSION

For the above reasons, the Trade Court's judgment affirming Commerce's *Final Results* should be sustained.

Respectfully submitted,

/s/ *Gilbert B. Kaplan*
Gilbert B. Kaplan
Daniel L. Schneiderman

Dated:  October 21, 2015          Counsel for Appvion, Inc.

**PAPIERFABRIK AUGUST KOEHLER SE v. US**                    *Public*
**CAFC Appeal No. 2015-1489**

## CERTIFICATE OF SERVICE

This is to certify that I have on this 21st day of October, 2015 caused the foregoing **RESPONSE BRIEF OF APPVION, INC.** to be served upon the following parties via method indicated below at the following addresses:

<u>**VIA CM/ECF:**</u>

Flora Amanda DeBusk
**Hughes Hubbard & Reed LLP**
1775 I Street, NW
Washington, DC 20006
debusk@hugheshubbard.com

Joshua E. Kurland
**Department of Justice**
Commercial Litigation Branch,
Civil Division
PO Box 480
Ben Franklin Station
Washington, DC 20044
Joshua.E.Kurland@usdoj.gov

*/s/ Gilbert B. Kaplan*
Gilbert B. Kaplan
**KING & SPALDING LLP**
1700 Pennsylvania Avenue, N.W.
Suite 200
Washington, D.C.  20006

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION, TYPEFACE
## REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned certifies that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B)(i). Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(a)(7)(B)(iii), this brief includes 13,354 words.

This brief has been prepared in Microsoft Office Word 2010 using a proportionally spaced typeface (14 point Times New Roman font). In preparing this certificate, the undersigned has relied upon the word count feature of this word-processing system as permitted by Fed. R. App. P. 32(a)(7)(C)(i).

*/s/ Gilbert B. Kaplan*
Gilbert B. Kaplan
Daniel L. Schneiderman

KING & SPALDING LLP

Counsel for Defendant-Appellee
Appvion, Inc.

Dated: October 21, 2015