2015-1489

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

PAPIERFABRIK AUGUST KOEHLER SE,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee,

and

APPVION, INC.,

Defendant-Appellee

Appeal from the United States Court Of International Trade,
in Case No. 1:13-cv-00163, Senior Judge Nicholas Tsoucalas.

**CORRECTED BRIEF OF DEFENDANT-APPELLEE
THE UNITED STATES, PUBLIC VERSION**

BENJAMIN C. MIZER
Principal Deputy Assistant
Attorney General

JEANNE E. DAVIDSON
Director

REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:                              JOSHUA E. KURLAND
JESSICA M. LINK                          Trial Attorney
Attorney                                 Department of Justice, Civil Division
Office of the Chief Counsel              Commercial Litigation Branch
for Trade Enforcement & Compliance       P.O. Box 480, Ben Franklin Station
U.S. Department of Commerce              Washington, DC  20044
Washington, DC 20230                     Telephone:  (202) 616-0477
                                         Facsimile:  (202) 307-0972
                                         Email: Joshua.E.Kurland@usdoj.gov


October 18, 2016                         *Attorneys for Defendant-Appellee*

# **TABLE OF CONTENTS**

STATEMENT OF THE ISSUES.................................................................1

STATEMENT OF THE CASE.................................................................1

STATEMENT OF FACTS ......................................................................2

   I.       Background Regarding Antidumping Proceedings...............................2

   II.      Administrative And Trial Court Proceedings In This Case .................5

SUMMARY OF THE ARGUMENT ......................................................11

ARGUMENT ........................................................................................12

   I.       Standard Of Review .........................................................................12

   II.      Commerce's Decision To Apply Total AFA To Koehler Is
           Supported By Substantial Evidence And Otherwise In
           Accordance With Law.......................................................................14

          A.      Commerce Lawfully Applied Total AFA To Koehler .............14

          B.      Koehler Fails To Demonstrate That Commerce Was
                 Required To Rely On Partial AFA ..........................................23

   III.     Commerce's Application Of The 75.36 Percent AFA Rate
           Was Lawful ......................................................................................30

          A.      Commerce's Use Of The Highest Rate From The
                 Petition Satisfied The Requirements For An AFA Rate..........30

          B.      Commerce Lawfully Selected The 75.36 Percent
                 Petition Rate ...........................................................................33

          C.      Commerce's Corroboration Analysis Was Reasonable ...........39

          D.      Commerce's Use Of The 75.36 Percent AFA Rate Is
                 Not Punitive ...........................................................................47

IV.     Commerce's Rejection Of Koehler's Concealed Home
Market Sales Was Lawful And Not An Abuse Of Discretion ............48

     A.    Commerce Satisfied The Requirements Of 19 U.S.C.
§ 1677m(d), To The Extent They Are Applicable....................49

     B.    Koehler Did Not Satisfy The Requirements Of 19
U.S.C. § 1677m(e) ...................................................................53

     C.    Commerce Did Not Abuse Its Discretion In Rejecting
Koehler's Data ..........................................................................58

CONCLUSION ....................................................................................59

# TABLE OF AUTHORITIES

## CASES

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
    Nos. 14-1514, 14-1647, 2015 WL 5781477 (Fed. Cir. Oct. 5, 2015) ......... *passim*

*Allegheny Ludlum Corp. v. United States*,
    215 F. Supp. 2d 1322 (Ct. Int'l Trade 2000) ......................................................27

*Appvion, Inc. v. United States*,
    No. 14-00143, 2015 WL 5449973 (Ct. Int'l Trade Sept. 17, 2015) ............. 14, 29

*Agro Dutch Industries Ltd. v. United States*,
    31 C.I.T. 2047 (Ct. Int'l Trade 2007) ............................................................ 51-52

*Atl. Sugar, Ltd. v. United States*,
    744 F.2d 1556 (Fed. Cir. 1984) ........................................................................13

*China Kingdom Import & Export Co. v. United States*,
    507 F. Supp. 2d 1337 (Ct. Int'l Trade 2007) ................................................ 51-52

*Consol. Edison Co. v. NLRB*,
    305 U.S. 197 (1938) ..........................................................................................13

*Consolo v. Fed. Mar. Comm'n*,
    383 U.S. 607 (1966) ..........................................................................................13

*Corus Staal BV v. United States*,
    393 F.3d 1343 (Fed. Cir. 2005) ........................................................................59

*Dongtai Peak Honey Indus. Co. v. United States*,
    777 F.3d 1343 (Fed. Cir. 2015) ................................................................... 31, 33

*Essar Steel Ltd. v. United States*,
    678 F.3d 1268 (Fed. Cir. 2012) ........................................................................17

*F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*,
    216 F.3d 1027 (Fed. Cir. 2000) ........................................................... 37, 38, 42

*Ferro Union, Inc. v. United States*,
    44 F. Supp. 2d 1310 (Ct. Int'l Trade 1999) ......................................................27

*Fujian Lianfu Forestry Co. v. United States*,
　　638 F. Supp. 2d 1325 (Ct. Int'l Trade 2009) .......................................19

*Fujian Lianfu Forestry Co. v. United States*,
　　700 F. Supp. 2d 1361 (Ct. Int'l Trade 2010) .......................................44

*Gallant Ocean (Thailand) Co. v. United States*,
　　602 F.3d 1319 (Fed. Cir. 2010) ................................................. *passim*

*Gant v. United States*,
　　417 F.3d 1328 (Fed. Cir. 2005) ................................................. 34, 56

*Gerber Food (Yunnan) Co., Ltd. v. United States*,
　　387 F. Supp. 2d 1270 (Ct. Int'l Trade 2005) ............................... 26, 27

*Home Meridian Int'l, Inc. v. United States*,
　　772 F.3d 1289 (Fed. Cir. 2014) ...........................................................16

*Hubscher Ribbon Corp. v. United States*,
　　942 F. Supp. 2d 1375 (Ct. Int'l Trade 2013) ................................. 33-34

*JBF RAK LLC v. United States*,
　　790 F.3d 1358 (Fed. Cir. 2015) ................................................. 34, 56

*Jiangsu Changbao Steel Tube Co. v. United States*,
　　884 F. Supp. 2d 1295 (Ct. Int'l Trade 2012) .......................................22

*KYD, Inc. v. United States*,
　　607 F.3d 760 (Fed. Cir. 2010) ................................................. *passim*

*Mukand, Ltd. v. United States*,
　　767 F.3d 1300 (Fed. Cir. 2014) ................................................. 5, 19

*Myland Industrial, Ltd. v. United States*,
　　31 C.I.T. 1696 (2007) .........................................................................50

*Nippon Steel Corp. v. United States*,
　　337 F.3d 1373 (Fed. Cir. 2003) ................................................. *passim*

*Nippon Steel Corp. v. United States*,
　　458 F.3d 1345 (Fed. Cir. 2006) .........................................................13

*Norsk Hydro Can., Inc. v. United States*,
    472 F.3d 1347 (Fed. Cir. 2006) ..........................................................................12

*NSK Ltd. v. United States*,
    170 F. Supp. 2d 1280 (Ct. Int'l Trade 2001) ................................................ 57, 58

*NSK Ltd. v. United States*,
    346 F. Supp. 2d 1312 (Ct. Int'l Trade 2004) .......................................................33

*NTN Bearing Corp. v. United States*,
    74 F.3d 1204 (Fed. Cir. 1995) ...................................................................... 55, 58

*PAM, S.p.A. v. United States*,
    582 F.3d 1336 (Fed. Cir. 2009) ................................................................... *passim*

*Papierfabrik August Koehler SE v. United States*,
    7 F. Supp. 3d 1304 (Ct. Int'l Trade 2014) .................................................. *passim*

*Papierfabrik August Koehler SE v. United States*,
    44 F. Supp. 3d 1356 (Ct. Int'l Trade 2015) ................................................ passim

*PSC VSMPO–AVISMA Corp. v. United States*,
    688 F.3d 751 (Fed. Cir. 2012) ...................................................................... 37, 58

*Qingdao Taifa Grp. Co. v. United States*,
    637 F. Supp. 2d 1231 (Ct. Int'l Trade 2009) ......................................................22

*Qingdao Taifa Grp. Co. v. United States*,
    780 F. Supp. 2d 1342 (Ct. Int'l Trade 2011) ......................................................45

*Shandong Huarong General Group Co. v. United States*,
    29 C.I.T. 1227 (2005) .........................................................................................34

*Shanghai Taoen Int'l Trading Co. v. United States*,
    360 F. Supp. 2d 1339 (Ct. Int'l Trade 2005) ......................................................33

*Steel Auth. of India v. United States*,
    149 F. Supp. 2d 921 (Ct. Int'l Trade 2001) ........................................... 19, 25, 29

*Ta Chen Stainless Steel Pipe, Inc. v. United States*,
    298 F.3d 1330 (Fed. Cir. 2002) ................................................................... *passim*

*Tianjin Machinery Import & Export Corp. v. United States*,
   752 F. Supp. 2d 1336 (Ct. Int'l Trade 2011) ...................................................... 27

*Tianjin Magnesium Int'l Co. v. United States*,
   844 F. Supp. 2d 1342 (Ct. Int'l Trade 2012) ............................................ *passim*

*Timken Co. v. United States*,
   354 F.3d 1334 (Fed. Cir. 2004) .................................................. 55, 56

*Timken U.S. Corp. v. United States*,
   434 F.3d 1345 (Fed. Cir. 2006) .................................................. 29, 55

*Tung Mung Dev. Co., Ltd. v. United States*,
   25 C.I.T. 752 (2001) .................................................. 49, 54

*Union Steel v. United States*,
   713 F.3d 1101 (Fed. Cir. 2013) .......................................................... 12

*U.S. Steel Corp. v. United States*,
   621 F.3d 1351 (Fed. Cir. 2010) ............................................................. 2

*U.S. Steel Corp. v. United States*,
   712 F. Supp. 2d 1330 (Ct. Int'l Trade 2010) ...................................................... 43

*United States v. Eurodif*,
   555 U.S. 305 (2009) ........................................................... 13

*Wuhu Fenglian Co. v. United States*,
   899 F. Supp. 2d 1355 (Ct. Int'l Trade 2013) ...................................................... 30

*Yantai Timken Co. v. United States*,
   521 F. Supp. 2d 1356 (Ct. Int'l Trade 2007) ...................................................... 58

*Zhejiang Dunan Hetian Metal Co., Ltd v. United States*,
   652 F.3d 1333 (Ct. Int'l Trade 2011) ................................................. 27

## STATUTES AND REGULATIONS

19 U.S.C. § 1673 (2012) ............................................................ 2

19 U.S.C. § 1675 (2012) ............................................................ 2

19 U.S.C. § 1677(9) (2012) ......................................................... 2, 16

19 U.S.C. § 1677e (2012) ................................................................ *passim*

19 U.S.C. § 1677m (2012) .............................................................. *passim*

19 C.F.R. § 351.301 ........................................................................ 8, 17

19 C.F.R. § 351.308 ........................................................................ *passim*

## ADMINISTRATIVE DETERMINATIONS

*Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part,* 76 Fed. Reg. 82, 268 (Dep't of Commerce Dec. 30, 2011) ........................................................ 5

*Lightweight Thermal Paper from Germany,* 77 Fed. Reg. 73, 615 (Dep't of Commerce Dec. 11, 2012) ........................................................ 9

*Lightweight Thermal Paper From Germany*, 78 Fed. Reg. 23,220 (Dep't of Commerce Apr. 18, 2013) ........................................................ 1

*Certification of Factual Information To Import Administration During Antidumping and Countervailing Duty Proceedings*, 78 Fed. Reg. 42,678 (Dep't of Commerce July 17, 2013) ........................................................ 17

## LEGISLATIVE MATERIALS

H.R. Rep. No. 103-826 (1994) ........................................................ 45, 46

S. Rep. No. 114-45 (2015) .............................................................. 40

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep. No. 103-316, *reprinted in* 1994 U.S.C.C.A.N. 4040 ...... 31, 40

Trade Preferences Extension Act of 2015, Pub. L. No. 114-27, 129 Stat. 362 ........................................................ 2, 40

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Rule 47.5, defendant-appellee's counsel states that he is unaware of any other appeal in or from this action that previously was before this Court or any other appellate court under the same or similar title.  Defendant-appellee's counsel is also unaware of any case pending in this or any other court that may directly affect or be affected by this Court's decision in this appeal.  We note for completeness that Commerce's determination in the second administrative review segment in this antidumping proceeding, in which Commerce based on the record of that segment also applied 75.36 percent as an adverse facts available rate to plaintiff Papierfabrik August Koehler SE, is currently pending before the trial court in *Papierfabrik August Koehler AG v. United States*, Ct. Int'l Trade No. 12-0091.

## STATEMENT OF THE ISSUES

1.      Whether the Department of Commerce (Commerce) lawfully determined that the deliberate concealment of certain home market sales by appellant Papierfabrik August Koehler SE (Koehler) warranted application of total adverse facts available.

2.      Whether Commerce's selection and corroboration of the 75.36 percent adverse facts available rate that it applied to Koehler was supported by substantial evidence and otherwise lawful.

3.      Whether Commerce's determination to reject Koehler's untimely submission of its previously concealed home market sales was supported by substantial evidence and otherwise lawful.

## STATEMENT OF THE CASE

This appeal concerns the 2010-2011 third administrative review of Commerce's antidumping duty order covering lightweight thermal paper (LWTP) from Germany.  Koehler appeals *Papierfabrik August Koehler SE v. United States*, 7 F. Supp. 3d 1304 (Ct. Int'l Trade 2014) (*Koehler I*) (JA7-15BB), the trial court's decision sustaining Commerce's determination in *Lightweight Thermal Paper from Germany*, 78 Fed. Reg. 23,220 (Dep't of Commerce Apr. 18, 2013) (final admin. review) (JA1952-54), and the accompanying Issues and Decision Memorandum (I&D Memo) (JA1930-51).

# STATEMENT OF FACTS

## I.   Background Regarding Antidumping Proceedings

The antidumping statute authorizes Commerce to apply remedial duties to foreign goods sold, or likely to be sold, in the United States "at less than fair value."  19 U.S.C. § 1673 (2012).[1]  Once Commerce investigates an allegation of dumping and issues an antidumping duty order, the agency, if requested, conducts annual administrative reviews, such as the one at issue in this case, to determine the amount of dumping and the duties owed during the review period.  19 U.S.C. §§ 1675(a)(1)(B), (2)(A).  To determine the level of dumping, Commerce calculates a "dumping margin" for each entry of subject merchandise under review.  19 U.S.C. § 1675(a)(2)(A)(ii).  A dumping margin is the amount by which "'normal value' (the price a producer charges in its home market) exceeds the 'export price' (the price of the product in the United States) or 'constructed export price' {a term not relevant to this case}."  *U.S. Steel Corp. v. United States*, 621 F.3d 1351, 1353 (Fed. Cir. 2010) (citing 19 U.S.C. § 1677(35)(A)) (footnotes omitted).

---

[1] Citations to Title 19 of the U.S. Code refer to the 2012 edition.  Section 502 of the Trade Preferences Extension Act of 2015, Pub. L. No. 114-27, 129 Stat. 362 (2015) (TPEA) amends certain of these provisions, particularly 19 U.S.C. § 1677e. Because the TPEA's amendments to section 1677e are prospective in nature they do not apply to this appeal.  *See Ad Hoc Shrimp Trade Action Comm. v. United States*, Nos. 2014-1514, 2014-1647, 2015 WL 5781477 (Fed. Cir. Oct. 5, 2015).

Generally speaking, if the home market sales included in the comparison are less than the export price sales at issue, this will result in a lower dumping margin. Conversely, higher-priced home market sales generally result in a higher dumping margin. Hence, Commerce in its administrative reviews seeks to gather complete information about a respondent's home market and United States sales through detailed questionnaires. Both company representatives and counsel must certify to the accuracy and completeness of the questionnaire responses. In some reviews, Commerce conducts "verification" of the information that a respondent supplies by traveling to the respondent's foreign offices and checking the information.

Sometimes, this process is insufficient for Commerce to obtain reliable information to use in its dumping calculations. In such cases, Commerce uses "facts otherwise available" for its calculations. In particular, Commerce must rely upon facts otherwise available if it does not have the necessary information for its calculations, or if an "interested party" or any other "person" withholds or fails to provide information, significantly impedes the proceeding, or provides information that cannot be verified. 19 U.S.C. § 1677e(a).

When a party's response to Commerce's request for information is deficient, prior to applying facts available Commerce must, to the extent practicable and subject to the requirements of 19 U.S.C. § 1677m(e), provide the party "an opportunity to remedy or explain the deficiency" in light of relevant time limits.

19 U.S.C. § 1677m(d).  In such cases, Commerce "shall not decline to consider" information so long as *each* of five conditions specified by section 1677m(e) is satisfied—including that the information is (1) timely, (2) verifiable, (3) not so incomplete as to be unreliable, (4) based on the party's cooperation to the best of its ability, and (5) usable without undue difficulties.

Next, in selecting from among facts otherwise available, Commerce may apply an inference adverse to an interested party if it determines that the party failed to cooperate by not acting to the best of its ability to comply with a request for information.  19 U.S.C. § 1677e(b).  Pursuant to 19 U.S.C. § 1677e(b), when applying an adverse inference, Commerce may rely on information from a variety of sources, including  (1) the petition, (2) a final determination, (3) a previous review under the order, or (4) any other information placed on the record.  If in doing so Commerce relies on "secondary information," rather than on information obtained during the course of the review, it must corroborate the secondary information, to the extent practicable, using independent sources that are reasonably at its disposal.  19 U.S.C. § 1677e(c); 19 C.F.R. § 351.308(d).

Applying this framework, Commerce may also disregard all of the information a party submits and determine the party's dumping margin using "total" adverse facts available (AFA).  Commerce relies on total AFA if it determines that a party's overall reported information is unreliable or unusable,

4

and relies on "partial" AFA if determines that a deficiency is limited to a discrete category of information. *Ad Hoc Shrimp*, 2015 WL 5781477, at \*14; *Mukand, Ltd. v. United States*, 767 F.3d 1300, 1308 (Fed. Cir. 2014). In this case, following Koehler's deliberate concealment and false representations regarding its home market sales, Commerce applied total AFA to Koehler.

## II.   Administrative And Trial Court Proceedings In This Case

In December 2011, Commerce initiated its third administrative review of the antidumping duty order on LWTP from Germany and selected Koehler as the mandatory respondent. *Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part*, 76 Fed. Reg. 82,268, 82,269 (Dep't of Commerce Dec. 30, 2011) (JA45-52).

Koehler responded to Commerce's standard antidumping questionnaire, purporting to provide information regarding the entirety of its home market sales, and certifying the accuracy and completeness of its reporting. JA58-59. In a supplemental questionnaire, Commerce asked Koehler to provide further clarifying details regarding its reported sales. JA492 (requesting that Koehler "{e}xplain how you identified which {LWTP} sales to include in your home market database" and "identify any differences between the methodology used in preparing the antidumping duty response from that used in the company's financial accounting records").

On May 18, 2012, the final day to submit new factual information, Appvion, Inc. (Appvion), formerly Appleton Papers, Inc., submitted information publicly alleging that Koehler had "engaged in a scheme to defraud the Department by intentionally concealing certain otherwise reportable home market transactions. . . . {by} selling 48 gram thermal paper that it knows is destined for consumption in Germany through various intermediaries in third-countries." JA928-29. Appvion further alleged that "Koehler is also using this scheme to artificially manipulate prices attributable to those sales of 48 gram paper shipped directly to its German customers." JA929. In support of its allegations, Appvion provided an affidavit from a confidential source, stating, again publicly, that "Koehler engages in these transshipments in order to avoid reporting the transactions as sales to Germany in response to the {United States} antidumping case." JA937. Koehler initially responded by characterizing Appvion's allegations as "{f}ictional." JA938.

Meanwhile, Koehler sought two extensions to the deadline to respond to Commerce's supplemental questionnaire. Koehler's first extension request cited the temporary absence of key personnel and need for additional time to prepare Koehler's response because of the number of documents involved. JA948-49. Commerce, employing standard language, granted this request "due to the unique circumstances" stated in Koehler's letter. JA953. Koehler then sought a second extension "to provide sufficient time for counsel to conduct due diligence in

connection with the substance of {the} allegations contained in Petitioner's May 18, 2012 letter." JA958. Commerce granted this second request in part, again citing the "unique circumstances" listed in Koehler's letter. JA963. In addition, Commerce extended the time limit for issuing its preliminary results. JA974-75.

On June 27, 2012, Koehler filed its supplemental questionnaire response, while also responding to the transshipment allegations. JA1031. Koehler stated that "{i}n response to the public portions of Petitioner's May 18, 2012 letter, and at the request of {Koehler}, the undersigned counsel conducted an investigation of Petitioner's allegations regarding the concealment of certain Koehler home market transactions." JA1040. Koehler continued that, "{a}s a result of that investigation, Koehler can confirm that certain sales of 48-gram lightweight thermal paper ("LWTP"), which were shipped to a third country, were ultimately delivered to customers in the German market, and should have been reported by Koehler as home market transactions." *Id.* Koehler later characterized its admission as an acknowledgment that the "public portions of {Appvion's} May 18 allegations were substantially correct." JA1426. Koehler further acknowledged that the scheme was designed to accommodate increased customer demand, while avoiding compliance with United States antidumping law. JA1042.

In addition, Koehler stated that "{a}lthough certain personnel at Koehler knew, at the date of sale, that the sales were in fact intended for delivery to

customers in Germany, these acts and omissions were undertaken without the authority or knowledge of the Chief Executive Officer, the Chief Financial Officer, the in-house counsel, or the Board of Directors of Koehler." JA1040. It added that it was taking disciplinary action against "*senior Koehler personnel* who developed and directed the sales strategy . . . that resulted in the underreporting of home market transactions." JA1043-44 (emphasis added). Koehler proceeded to provide proprietary details of the transshipped sales transactions, and attached a revised home market sales database, "which include{d} all such sales that were not, but should have been, reported as home market sales."[2] JA1040-43.

Commerce subsequently rejected Koehler's revised home market sales database as untimely filed new factual information that Commerce had not solicited. JA1364-65. In doing so, Commerce determined that Koehler was required under 19 C.F.R. § 351.301(c)(2) to submit all of its home market sales of subject merchandise from the review period by February 27, 2012, the deadline for its relevant questionnaire response. JA1364. In addition, Commerce noted that, pursuant to 19 C.F.R. § 351.301(b)(2), the deadline for new factual information was May 18, 2012. *Id.* Commerce also stated that its supplemental questionnaire "requested specific clarifying information regarding Koehler's initial questionnaire

---

[2] Because Koehler publicly summarized much of this information in its administrative case brief, the fact that Koehler submitted a revised home market sales database with its previously omitted sales is public information. JA1825.

response, which did not include any request for the additional sales data submitted in Koehler's revised home market sales database{.}" *Id.* Lastly, Commerce found that "Koehler did not provide any basis to conclude that good cause exists to extend the deadline pursuant to 19 C.F.R. § 351.302(b)." JA1365. Commerce thus requested that Koehler re-file its submission without the untimely information. *Id.*

After receiving and considering numerous additional submissions by both Koehler and Appvion regarding the impact of Koehler's false sales reporting, Commerce issued the preliminary results of the review. *Lightweight Thermal Paper from Germany*, 77 Fed. Reg. 73,615 (Dep't of Commerce Dec. 11, 2012) (JA1733-34). In its decision memo, Commerce stated that "{e}vidence on the record (*i.e.*, Petitioner's allegations and Koehler's acknowledgement those allegations) indicates that Koehler knowingly and deliberately withheld information from the Department that should have been provided in its initial questionnaire response." JA1707; *see also* JA1732A-B (AFA memo reflecting same determination). Commerce thus determined, pursuant to 19 U.S.C. §§ 1677e(a)(2)(A)-(D), that application of facts otherwise available was appropriate because Koehler withheld information that Commerce requested, failed to provide information timely or in the form or manner requested, significantly impeded the proceeding, and provided information that could not be verified. JA1707-08 (prelim. decision memo); 1732G-J (AFA memo).

9

Commerce additionally determined that applying total AFA was appropriate because Koehler had failed to act to the best of its ability and it was not possible to reach any reliable conclusions based on the unreliable information Koehler had submitted. JA1708-10, 1732K-P. It stated that Koehler's actions amounted to an "extraordinary situation where Koehler deliberately coordinated with multiple parties, even prior to this administrative review, to structure its sales, pricing, and shipping procedures in a manner that would enable it to manipulate its sales prices reported to the Department." JA1732O. It also explicitly indicated that Koehler's post-disclosure conduct did not restore its confidence in Koehler. JA1732P.

In selecting an AFA rate to apply to Koehler, Commerce relied on the highest petition margin listed in the initiation notice for the antidumping duty investigation, which was 75.36 percent. JA1712. To corroborate the petition rate, Commerce examined the range of Koehler's transaction-specific dumping margins for the second review—data that Appvion had placed on the record in calling for Commerce to apply AFA. JA1711-12, 1732Q-R. Commerce determined that the 75.36 percent rate fell within this range of Koehler's transaction-specific margins, which included Koehler's highest transaction-specific margin from the second review of 144.63 percent, demonstrating that the petition rate was reliable and relevant, had probative value, and was corroborated to the extent practicable. *Id.*

10

In April 2013, Commerce issued its final results of the review, in which it maintained its preliminary determinations and continued to apply a total AFA rate of 75.36 percent to Koehler.  JA1930-51, 1952-54.  Koehler challenged the final results, arguing that Commerce had (1) improperly rejected Koehler's revised home market sales database, (2) improperly resorted to total AFA, and (3) improperly selected and corroborated the 75.36 percent AFA rate.  JA1957-2024.

The trial court sustained Commerce's determination in its entirety.  *See generally Koehler I*, 7 F. Supp. 3d 1304, *reconsideration denied*, 44 F. Supp. 3d 1356 (Ct. Int'l Trade 2015) (*Koehler II*).  The court agreed that Koehler did not cooperate to the best of its ability with Commerce's request for home market sales data, that Commerce properly rejected Koehler's untimely alleged submission of the home market sales data that Koehler had previously concealed, that Commerce reasonably applied total AFA, and that Commerce properly selected and corroborated the 75.36 percent AFA rate.  *Id.*  This appeal followed.

## SUMMARY OF THE ARGUMENT

The issues on appeal stem from the fact that Koehler engaged in a deliberate scheme to conceal home market sales by transshipping them through third country intermediaries, and thereby falsifying its reporting to Commerce—allegations that Koehler acknowledged and confirmed.  In light of these circumstances, the trial court properly held that Commerce lawfully applied total AFA to Koehler.

11

Koehler's falsification of its sales data constitutes a clear failure by the company to cooperate to the best of its ability, and Commerce reasonably determined that Koehler's actions rendered its overall data unreliable.

The trial court also properly held that Commerce's selection of the 75.36 percent petition rate as AFA was lawful because the agency reasonably determined that the rate was reliable and relevant to Koehler. Specifically, Commerce lawfully corroborated the rate by demonstrating that it fell within the range of Koehler's own reported transactions from the immediately preceding review.

Finally, notwithstanding Koehler's attempt allegedly to submit its previously concealed sales as part of a revised home market sales database, the trial court properly held that Commerce lawfully rejected the revised database because it contained untimely new factual information that Commerce had not solicited.

## ARGUMENT

### I.    Standard Of Review

This Court applies "the same standard of review the Court of International Trade used in reviewing the Commerce administrative record." *Norsk Hydro Can., Inc. v. United States*, 472 F.3d 1347, 1357 (Fed. Cir. 2006). Thus, the Court upholds Commerce's determination unless it is unsupported by substantial record evidence, or otherwise not in accordance with law. *Union Steel v. United States*, 713 F.3d 1101, 1106 (Fed. Cir. 2013) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)); *see*

*also United States v. Eurodif*, 555 U.S. 305, 316 n.6 (2009) ("The specific factual findings on which {Commerce} relies . . . are conclusive unless unsupported by substantial evidence."). Although this amounts to repeating the trial court's work, this Court has declared that it "will not ignore the informed opinion of the {CIT}." *Ad Hoc Shrimp*, 2015 WL 5781477, at *6 (citations and quotation marks omitted).

Substantial evidence connotes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Substantial evidence may also be "less than the weight of the evidence," and the possibility of drawing inconsistent conclusions from the record does not render Commerce's findings unsupported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). A party disputing Commerce's determination as unsupported by substantial evidence thus "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted), and the Court will sustain Commerce's determinations if they are reasonable and supported by the record as a whole, even if some evidence detracts from them. *See Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

**II.    Commerce's Decision To Apply Total AFA To Koehler Is Supported By Substantial Evidence And Otherwise In Accordance With Law**

### A. Commerce Lawfully Applied Total AFA To Koehler

Key facts in this case are undisputed.  Prior to the third review period, Koehler created a scheme to avoid reporting certain home market sales that fell within the scope of Commerce's review and that Koehler would otherwise be required to report in response to Commerce's dumping questionnaire.[3]  To do this, Koehler disguised certain higher-priced sales that were intended for the German market as sales to a third-country.  By concealing higher-priced sales, Koehler increased its chances of obtaining a lower dumping margin.  Appvion uncovered the scheme in May 2012, and despite initially denying the allegations as "fictional" (JA938), Koehler admitted the scheme in June 2012.  This occurred months into Commerce's review—long after Koehler purported to provide Commerce with complete and accurate sales reporting.  *See* JA1706-07, 1732D-G, 1937.

---

[3] Koehler has admitted that the scheme began during the second review period and continued until after Appvion revealed it in May 2012.  JA1041, 1931.  Koehler's actions thus span the time periods covered by the second, third, and fourth reviews. In *Papierfabrik August Koehler AG v. United States*, Ct. Int'l Trade No. 12-00091, Commerce sought a voluntary remand of its determination in the second review to consider the effect of its findings in this third review, subsequently applying total AFA to Koehler.  That decision is pending before the Court of International Trade. In the fourth review, Koehler properly reported all of its sales (including those it had transshipped) and Commerce verified the accuracy of Koehler's reporting.  In *Appvion, Inc. v. United States*, Ct. Int'l Trade No. 14-00143, the court sustained Commerce's determination not to apply AFA given Koehler's complete, timely reporting of its home market sales.  *Appvion, Inc. v. United States*, No. 14-00143, 2015 WL 5449973 (Ct. Int'l Trade Sept. 17, 2015).

In short, the record of this review, including Appvion's allegations and Koehler's admissions, demonstrates that Koehler engaged in a fraudulent scheme, deliberately concealing required information, and falsely reporting its home market sales. Indeed, Koehler admits that such a scheme took place, leading to its failure to provide an accurate and complete response to Commerce's questionnaire, but attempts to absolve itself of responsibility by placing blame on an unidentified group of individual Koehler employees. *See* Koehler Br. 4. Koehler's omissions and assertions have several important implications for this appeal.

As an initial matter, the trial court properly declined to credit Koehler's self-serving characterizations of its actions in connection with the transshipment scheme—and this Court should do the same. For example, seeking to frame the issues in a manner more favorable to its interests, Koehler continues to assert repeatedly that its transshipment scheme was perpetrated by "a small number of Koehler employees" acting without the knowledge of "senior management." *E.g.*, Koehler Br. 4, 5, 6, 18, 19. Contrary to these claims, Koehler admitted in its supplemental questionnaire response to Commerce that the transshipment scheme developed from customer communications at a "senior executive" level and that "senior Koehler personnel . . . developed and directed the sales strategy for the two Koehler customers in question that resulted in the underreporting of home

market transactions."[4]  JA1042, 1043-44.  The trial court recognized the self-serving (and thus unreliable) nature of Koehler's characterizations in *Koehler I* when it held that Koehler's "alternative interpretation of the record . . . is neither legally nor factually sufficient to warrant overturning Commerce's decision," 7 F. Supp. 3d at 1311 (JA15J-K), and noted the inconsistency between Koehler's third review submission and its self-serving characterizations regarding its "senior management" knowledge.  *See id.*; *Koehler II*, 44 F. Supp. 3d at 1358 (re-affirming that "Koehler's argument that 'supervisors' and 'senior management' were unaware of the transshipments is not supported by the record"); *cf. Home Meridian Int'l, Inc. v. United States*, 772 F.3d 1289, 1295 (Fed. Cir. 2014) (declining to credit assertions made through counsel in briefs before Commerce).

Additionally, Koehler's suggestion that its self-serving characterizations lessen its responsibility for the transshipment scheme is incorrect.  Koehler was the "interested party" subject to review under 19 U.S.C. §§ 1677(9) and 1677e(b), and as such "was required to 'have familiarity with all of the records it maintains' and 'conduct prompt, careful, and comprehensive investigations of all relevant records.'"  *Koehler I*, 7 F. Supp. 3d at 1311 (quoting *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003)).  Hence, "Koehler {was} responsible for the actions of its entire company, especially any actions that may have an effect

---

[4] Koehler's brief paraphrases this language, omitting "senior."  Koehler Br. 6-7.

on its reporting to {Commerce}" and bore the burden of maintaining adequate monitoring and controls. *Id*. (citation omitted); JA1732O.

Commerce's and the trial court's determinations also reflect the purpose behind requiring company certifications. Commerce "obtains most of its factual information in antidumping and countervailing duty proceedings from submissions made by interested parties during the course of the proceeding." 19 C.F.R. § 351.301. If Commerce cannot trust parties' diligence in preparing and certifying submissions, it would render the process meaningless. *See Certification of Factual Information To Import Administration During Antidumping and Countervailing Duty Proceedings*, 78 Fed. Reg. 42,678, 42,683 (Dep't of Commerce Jul. 17, 2013) (discussing importance of accountability for certified submissions).

Thus, Commerce properly determined that Koehler as a whole was responsible for providing truthful and accurate information. But given the self-serving nature of Koehler's assertions, this Court also should not credit them.[5]

---

[5] The same is true of Koehler's self-serving characterizations regarding other details surrounding its scheme, such as the effectiveness of its internal controls, disciplinary actions against unspecified employees, and remedial actions. Antidumping proceedings are not a proper forum to conduct an in-depth fraud investigation into Koehler's representations, nor has Koehler placed the details that underlie its representations on the record. Thus, the Court's focus should be on the criteria relating to application of AFA, not Koehler's claims about its controls and remedial actions. *See Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1276 (Fed. Cir. 2012) (discussing importance of Commerce's ability to apply AFA, in light of its lack of subpoena power to scrutinize these types of issues).

Turning to the substance of Commerce's determination, the trial court correctly held that Commerce properly applied AFA to Koehler in light of the transshipment scheme. *See Koehler I*, 7 F. Supp. 3d at 1310-12; *Koehler II*, 44 F. Supp. 3d at 1358. To support its determination, Commerce explained that Koehler's actions satisfied each of the five independent criteria for applying facts available under 19 U.S.C. § 1677e(a): Koehler (1) prevented Commerce from obtaining necessary information related to its dumping margin; (2) withheld information that Commerce had requested; (3) failed to provide information in a timely manner or in the form or manner requested by Commerce; (4) significantly impeded the proceeding; and (5) provided unverifiable information. *See* JA1707-08 (prelim. decision memo); 1732G-J (AFA memo); 1935-37 (I&D Memo).

Pursuant to section 1677e(b), Commerce properly determined that Koehler's actions demonstrated its failure to act to the best of its ability by completely and accurately reporting its sales. This Court describes the "best of its ability" standard as mandating that a respondent "do the maximum it is able to do" and has made clear that, although the statute does not contain an intent element, "intentional conduct, such as deliberate concealment or inaccurate reporting, surely evinces a failure to cooperate." *Nippon Steel*, 337 F.3d at 1382, 1383. Commerce explained in this case that record evidence, including Appvion's allegations and Koehler's acknowledgement of the transshipment scheme, established that Koehler engaged

18

in an improper scheme, deliberately concealed essential information, and failed to report all of its home market sales. *See* JA1709-10, 1732M-P, 1941-43.

The primary thrust of Koehler's AFA challenge on appeal is that, despite the transshipment scheme, it was allegedly inappropriate for Commerce to apply total rather than partial AFA to Koehler because Kohler's "omission" of a portion of its home market sales did not affect the remainder of its falsified reporting in the review. *See* Koehler Br. 13-22. These contentions lack merit because Koehler's actions impugned the credibility of its overall reporting.

Commerce may apply total AFA when it "is unable to calculate an antidumping rate for an uncooperative respondent because the information required for such a calculation (the respondent's sales and cost information for the subject merchandise during the period of review) is found to be unreliable." *Fujian Lianfu Forestry Co. v. United States*, 638 F. Supp. 2d 1325, 1334 (Ct. Int'l Trade 2009); *Steel Auth. of India v. United States*, 149 F. Supp. 2d 921, 927-28 (Ct. Int'l Trade 2001). Further, this Court has held that "{i}n general, use of partial facts available is not appropriate when the missing information is core to the antidumping analysis and leaves little room for the substitution of partial facts without undue difficulty." *Ad Hoc Shrimp*, 2015 WL 5781477, at *14 (quoting *Mukand*, 767 F.3d at 1308).

Commerce reasonably determined in this case that Koehler's involvement in a scheme to withhold reportable home market sales discredited the reliability of its

overall reporting.  Specifically, "Koehler's pattern of concealment regarding its transshipments, combined with the fact that Koehler and its counsel certified to the accuracy of responses based on such schemes, significantly undermines the credibility and reliability of Koehler's data overall."  JA1732M; *see also* JA1732L (articulating similar conclusion); JA1709 (same); JA1936 (same).  Moreover, Commerce explained that Koehler had "deliberately engaged in a scheme to manipulate its home market prices  . . . significantly impeding the Department's ability to conduct the instant review" and that Koehler's actions constituted a "material omission" that prevented Commerce from relying on "any of Koehler's submitted information to calculate an accurate dumping margin."  JA1732L-M.  Commerce also specified how the missing sales data went to the core of its dumping calculations, explaining that "because it is not possible to determine {normal value} using information on the record of this review, the Department is unable to perform any comparisons to U.S. prices."  *Id*.; JA1709 (same).  In short, contrary to Koehler's claims, Commerce properly concluded that the entirety of Koehler's reporting, not just the omitted sales, was affected by Koehler's scheme.

Likewise, the trial court correctly held that "{t}his was not, as Koehler suggests, a case where the respondent's conduct affected only a discrete category of information."  *Koehler I*, 7 F. Supp. 3d at 1314 (citation omitted).  The court elaborated:  "{t}he effects of {Koehler's} conduct extended beyond the omitted

sales because Commerce could not make the comparisons between the normal value and U.S. prices necessary for calculating the dumping margin." *Id.* (citation omitted). Thus, "{b}ecause Koehler's sales data was incomplete and unreliable, Commerce reasonably concluded that it could not calculate the dumping margin using this data." *Id.* (citations omitted); *see also id.* at 1315 ("Commerce could not determine the dumping margin without complete and reliable sales data and, therefore, reasonably declined to use the selectively submitted information of an uncooperative respondent."); *Koehler II*, 44 F. Supp. 3d at 1358 (re-affirming).

The trial court's holding closely resembles this Court's own holding in its recent decision in *Ad Hoc Shrimp*—a highly analogous case. In *Ad Hoc Shrimp*, the foreign respondent had concealed the existence of a Cambodian affiliate implicated in a transshipment scheme and, although eventually admitting to the Cambodian affiliate's existence, argued that Commerce's application of total AFA was improper because the affiliate's existence did not affect the accuracy of the remainder of the reporting in the review. *See Ad Hoc Shrimp*, 2015 WL 5781477, at *13-14. Rejecting this argument, the Court affirmed Commerce's determination to apply total AFA because the respondent's actions meant that Commerce could not rely on any of the company's submissions in the review. *See id.* The Court specifically highlighted the "impeachment of {the respondent's} credibility as a consequence of evidence reasonably indicating that {it} deliberately withheld and

misrepresented information" and explained that the misrepresentations "may reasonably be inferred to pervade the data in the record beyond that which Commerce has positively confirmed as misrepresented." *Id*. at \*14 (citation omitted). Thus, the Court held that Commerce had properly determined that the respondent's misrepresentations rendered the entirety of its submissions unreliable and that the missing information was "core" rather than tangential. *Id*.

Other court decisions have employed similar reasoning. *See, e.g.*, *Jiangsu Changbao Steel Tube Co. v. United States*, 884 F. Supp. 2d 1295, 1306 (Ct. Int'l Trade 2012) ("In sum, the inference that a respondent's failure to disclose willful deception until faced with contradictory evidence implicates the reliability of that respondent's remaining representations is reasonable."); *Qingdao Taifa Grp. Co. v. United States*, 637 F. Supp. 2d 1231, 1239-40 (Ct. Int'l Trade 2009) (because Taifa attempted to withhold or alter requested sales documents, Commerce properly concluded that information Taifa provided was incomplete and unreliable); *Tianjin Magnesium Int'l Co. v. United States*, 844 F. Supp. 2d 1342, 1348 (Ct. Int'l Trade 2012) (rejecting notion that "other than the established fabrications Tianjin submitted in an attempt to lower its margin, it fully cooperated in the review"), *aff'd after remand*, 552 Fed. App'x 986 (Fed. Cir. 2014).

Thus, Commerce's total AFA determination in this case is both consistent with abundant precedent and independently reasonable.

### B. Koehler Fails To Demonstrate That Commerce Was Required To Rely On Partial AFA

Koehler argues that Commerce's reliance on total AFA was improper because (1) the omitted home market sales allegedly constituted a discrete category of information, (2) Koehler's conduct allegedly "had no bearing" on the majority of the data it did report, and (3) Commerce allegedly could have applied partial AFA without undue difficulty because the purportedly usable data on the record could easily have been verified. *See* Koehler Br. 14. We address each of Koehler's meritless arguments in turn.

First, Koehler incorrectly posits that there exists a discrete, well-defined data set that can be easily identified as the "omitted" sales, to which Commerce should apply partial facts available in a "gap-filling" exercise. Koehler Br. 14-15. This claim is improper because its relies on data that is not on the record as a direct result of Koehler's transshipment scheme, that Commerce properly rejected as untimely, and that lacks reliability due to Koehler's fraudulent actions. Thus, aside from Koehler's assertions, there is no record evidence to support Koehler's claims with respect to "an identifiable subset" or "fraction" of Koehler's overall data.

More fundamentally, the trial court correctly held that "Koehler views its conduct too narrowly." *Koehler I*, 7 F. Supp. 3d at 1314. The trial court explained that, contrary to Koehler's claims about the limited effects of its actions, "Koehler manipulated its sales data by concealing certain home market sales detrimental to

its dumping margin." *Id*. The effects of Koehler's conduct "extended beyond the omitted sales" because Koehler's concealment of a portion of its sales meant that Commerce could not make the price comparisons necessary for calculating the dumping margin, and thus reasonably concluded that it could not calculate the dumping margin using Koehler's incomplete data. *Id*. (citations omitted). The trial court also correctly sustained as reasonable Commerce's determination that Koehler's actions had undermined the credibility of its data overall. *See id*.; *see also Koehler II*, 44 F. Supp. 3d at 1358 (re-affirming holdings).

Commerce's and the trial court's straightforward determinations regarding the effects of Koehler's actions in falsifying its data directly contradict Koehler's claims that it "had submitted extensive and usable data," that "Commerce never identified specific deficiencies in Koehler's U.S. sales or cost data," and that there "is no evidence calling into question the reliability of the data that was submitted as part of Koehler's original questionnaire response." *Compare* Koehler Br. 15 *with Ad Hoc Shrimp*, 2015 WL 5781477, at *13-14 (holding, in sustaining very similar determination, that company's misrepresentations pervaded its data).[6]

---

[6] Koehler asserts that Commerce in one instance stated that "there is insufficient information on the record to find Koehler's financial statements to be unreliable." Koehler Br. 19 (quoting JA1732J). Commerce, however, reached this conclusion in addressing a specific argument by Appvion regarding Koehler's financial statements, and ultimately determined that it did not affect the overall finding that Koehler's activity warranted the application of total AFA. *See id*.

Nor, as we demonstrate below, did the information in Koehler's original questionnaire response satisfy the requirements for Commerce to consider it under 19 U.S.C. § 1677m(e) when Koehler clearly failed to act to the best of its ability in providing information that "omitted" the sales that Koehler had deliberately concealed in its reporting. Indeed, as the trial court explained, "if {Commerce} were forced to use the partial information submitted by respondents, interested parties would be able to manipulate the process by submitting only beneficial information." *Koehler I*, 7 F. Supp. 3d at 1314 (quoting *Steel Auth.*, 149 F. Supp. 2d at 928). To hold otherwise would allow respondents to control what data would be used by submitting partial information, which would be "in direct contradiction to the policy behind the use of facts available." *Id*.

Thus, contrary to Koehler's second set of arguments, this is not "precisely the type of scenario" in which partial AFA is appropriate (Koehler Br. 15)—it is precisely the type of scenario in which courts repeatedly have affirmed application of total AFA. *See*, *e.g.*, *Ad Hoc Shrimp*, 2015 WL 5781477, at *13-14; *see also Tianjin Magnesium*, 844 F. Supp. 2d at 1348 (remanding determination in which Commerce originally *failed* to apply AFA in similar circumstances). The Court of International Trade in *Tianjin Magnesium* succinctly described the pitfalls of failing to apply AFA in these circumstances:

> If Commerce does not detect the false documents, a lower margin is obtained. If Commerce does detect the

> falsehood, such conduct is simply removed from consideration while Commerce focuses on all the ways in which the respondents did cooperate. Such an approach ignores that fact that a{n} important purpose of section 1677e(b) is to provide respondents with an incentive to cooperate.

844 F. Supp. 2d at 1348 (citation, ellipsis, and quotation marks omitted).

By contrast, the cases that Koehler relies upon to claim that its actions only affected a discrete category of information are inapposite because none involves a situation in which a respondent engaged in a transshipment scheme to withhold requested information. *See* Koehler Br. 16-18. In *Gerber Food (Yunnan) Co., v. United States*, Commerce found that a producer and exporter were involved in an improper export agency agreement that did not impugn the remainder of their data. The court thus held that Commerce had failed to establish that the remaining data, which it had already verified, was unreliable. *See* 387 F. Supp. 2d 1270, 1283 (Ct. Int'l Trade 2005) (having made favorable findings, Commerce could not refuse to consider data). Moreover, unlike *Gerber*'s statement that, although the companies may have been "less than forthcoming . . . this record evidence is not sufficient to impugn the veracity of all other record evidence," *id*. at 1282, Commerce in this case determined that Koehler's outright falsification was sufficient to impugn the reliability of its remaining data. Courts have repeatedly sustained application of total AFA when parties' misconduct with respect to one aspect of their responses impugned the remainder of their submissions. *See*, *e.g.*, *Changbao Steel*, 884 F.

26

Supp. 2d at 1310 (distinguishing *Gerber*). *Zhejiang DunAn Hetian Metal Co. v. United States*, which Koehler emphasizes cited *Gerber* approvingly, involved an instance in which no party challenged Commerce's application of partial rather than total AFA. *See* 652 F.3d 1333, 1345 (Fed. Cir. 2011).

In *Ferro Union, Inc. v. United States*, the court in overturning Commerce's application of total AFA indicated that the respondent's failure to report certain affiliations stemmed from new laws and unclear requests by Commerce. *See* 44 F. Supp. 2d 1310, 1331-32 (Ct. Int'l Trade 1999). But those facts are inapplicable in this case because Koehler purposefully withheld its sales despite clear instructions. *See Allegheny Ludlum Corp. v. United States*, 215 F. Supp. 2d 1322, 1342 (Ct. Int'l Trade 2000) (distinguishing *Ferro Union*).

Koehler's reliance on *Tianjin Machinery Import & Export Corp. v. United States* is similarly misplaced because the court in that case *sustained* Commerce's determination to apply total AFA, but remanded for Commerce to reconsider the *rate* it selected. *See* 752 F. Supp. 2d 1336, 1341 (Ct. Int'l Trade 2011). On remand, the company presented charts regarding certain aspects of its dumping margin in past reviews, which Commerce rejected. *See id.* at 1343. In that different context, the Court stated that the use of AFA resulting from the fraudulent scheme could not be used to disregard unrelated information, such as information from past reviews that had nothing to do with the fraudulent scheme. *Id.* at 1344.

Koehler next claims that its alleged remedial actions following disclosure of its scheme support the notion that Commerce should have relied on the remaining information in Koehler's original falsified submissions. *See* Koehler Br. 18-19. Commerce explicitly considered Koehler's post-disclosure actions and stated:

> Although Koehler took certain measures after the allegation was made by Petitioner and acknowledged by Koehler, we do not find that such actions taken by Koehler restore our confidence in the reliability of its home market sales data submitted for this review, especially given the extent of the fraudulent activity involved in this transshipment scheme.

JA1732O-P; *see also* JA1942-43 (also considering issue). Commerce's conclusion was reasonable because Commerce cannot ignore the totality of the evidence, and must give due consideration to the fact that Koehler deliberately misled it, which Koehler's "remedial efforts" after its fraudulent behavior came to light do not alter. As the trial court held in *Koehler I*, "Koehler's remedial efforts did not reestablish its cooperation with the review. . . . Koehler began these efforts only *after* it was confronted with allegations of misconduct. . . . Commerce reasonably concluded that these efforts failed to 'restore {its} confidence in the reliability of {Koehler's} home market sales data.'" 7 F. Supp. 3d at 1311 (citations omitted).

Third, Koehler's argument that "Commerce could have easily applied partial AFA without undue difficulty" has numerous flaws. *See* Koehler Br. 20. As an initial matter, it ignores the implications of Koehler's transshipment scheme in

28

impugning the overall credibility of its reporting in the review. Moreover, to apply partial AFA in the manner Koehler advocates, Commerce would need to rely on Koehler's representations regarding the scope of its missing sales, about which there is no evidence on the record because Koehler initially withheld them and Commerce properly rejected its post-disclosure efforts to submit them. *See Tianjin Magnesium*, 844 F. Supp. 2d at 1348; *Steel Auth.*, 149 F. Supp. 2d at 928. Moreover, Koehler's argument that Commerce should have compared Koehler's United States sales of 48-gram paper to its home market sales of 55-gram paper is meritless. *See* Koehler Br. 20-21. The trial court rejected this argument, holding that "Commerce could not determine the dumping margin without complete and reliable sales data and, therefore, reasonably declined to use the selectively submitted information of an uncooperative respondent." *Koehler I*, 7 F. Supp. 3d at 1315; *see also Appvion*, 2015 WL 5449973, at *4 (sustaining fourth review determination that home market prices across products are not comparable).

Koehler's remaining arguments are equally meritless. Contrary to Koehler's contention that Commerce should have performed a verification on its concealed sales, Commerce explained that its "standard verification procedures were not established to confirm the veracity of this type of sales information, which would require extraordinary measures outside the scope of a typical sales verification." JA1732J. Although Koehler cites *Timken U.S. Corp. v. United States*, 434 F.3d

29

1345, 1354 (Fed. Cir. 2006), for the notion that if Commerce has doubts about the veracity of new information the proper recourse is verification, *see* Koehler Br. 21, this is not an instance when a party submitted corrective information with respect to data already on the record. *See*, *e.g.*, *Wuhu Fenglian Co. v. United States*, 899 F. Supp. 2d 1355, 1362 (Ct. Int'l Trade 2013) (distinguishing *Timken*).  Nor is the fact that Commerce conducted verification in the fourth review, when Koehler fully cooperated in responding to Commerce's information requests, proof that verification in this review was feasible.  *See* Koehler Br. 21-22.  As the trial court held, "because Koehler cooperated during {the fourth review}, providing Commerce with timely and complete home market sales data, the facts of {the fourth review} differ from the instant case."  *Koehler I*, 7 F. Supp. 3d at 1312 n.7.

## III.  Commerce's Application Of The 75.36 Percent AFA Rate Was Lawful

### A. Commerce's Use Of The Highest Rate From The Petition Satisfied The Requirements For An AFA Rate

In applying total AFA, Commerce selected the highest rate from the petition, 75.36 percent.  The trial court correctly held that this determination was supported by substantial evidence and lawful.  *See Koehler I*, 7 F. Supp. 3d at 1315-18.

In selecting an AFA rate, Commerce adhered to 19 U.S.C. § 1677e(b), which explicitly authorizes Commerce to rely on information from the petition, among other sources.  *See also* 19 C.F.R. § 351.308(c).  When selecting an adverse rate from among the possible sources, Commerce seeks to use a rate that is

sufficiently adverse to effectuate the AFA rule's statutory purposes of inducing

respondents to provide Commerce with complete and accurate information in a

timely manner.  This ensures "that the party does not obtain a more favorable result

by failing to cooperate than if it had cooperated fully."  Uruguay Round

Agreements Act, Statement of Administrative Action, H.R. Rep. No. 103-316, at

870 (1994), *reprinted in*, 1994 U.S.C.C.A.N. 4040, 4199 (SAA).  In addition, 19

U.S.C. § 1677e(c) requires Commerce to corroborate a petition rate—to the extent

practicable—with independent sources that are reasonably at its disposal.

Commerce's practice is to use as AFA the higher of either (1) the highest

petition margin listed in the initiation notice for the investigation, or (2) the highest

margin calculated for any respondent in any segment of the proceeding.  *See*

JA1712, 1947.  This practice reflects an appropriate balance between selecting a

rate reasonably related to a respondent's commercial activity and the goal of

deterring future non-compliance.  *See KYD, Inc. v. United States*, 607 F.3d 760,

766 (Fed. Cir. 2010) (selection of highest prior margin as AFA reflects "common

sense inference that the highest prior margin is the most probative evidence of

current margins because, if it were not so, the responding party knowing of the

rule, would have produced *current* information showing the margin to be less"

(citation and quotation marks omitted)); *Dongtai Peak Honey Indus. Co. v. United

States*, 777 F.3d 1343, 1356 (Fed. Cir. 2015) (quoting *KYD*).

This Court recognizes that Commerce has broad discretion in selecting an AFA rate. *See PAM, S.p.A. v. United States*, 582 F.3d 1336, 1340 (Fed. Cir. 2009) ("Commerce's discretion in applying an AFA margin is particularly great when a respondent is uncooperative by failing to provide or withholding information."). Thus, the Court has affirmed Commerce's reliance on data "reflective of some, albeit a small portion, of {a respondent's} actual sales" because "{s}o long as the data is corroborated, Commerce acts within its discretion when choosing which sources and facts it will rely on to support an adverse inference." *Id.* (quoting *Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1339 (Fed. Cir. 2002)) (affirming, respectively, reliance on data comprising only 0.5 percent and 0.04 percent of sales during period of review). The Court has also "made clear . . . that Commerce need not select, as the AFA rate, a rate that represents the typical dumping margin for the industry in question." *KYD*, 607 F.3d at 765-66; *Ad Hoc Shrimp*, 2015 WL 5781477, at *18.

In this case, Commerce, consistent with its practice, relied on the highest petition margin listed in the initiation notice for the investigation, 75.36 percent. Moreover, as we discuss below, Commerce corroborated this rate with a range of Koehler's reported transaction-specific margins from the previous review, showing that the rate was reliable and relevant to Koehler. *See* JA1710-12, 1732P-R, 1946-47. Consequently, Koehler's challenges to the 75.36 percent rate lack merit.

## B. __Commerce Lawfully Selected The 75.36 Percent Petition Rate__

Koehler's initial set of arguments posits defects in the petition rate, none of which impugn the lawfulness of using as AFA a petition rate corroborated with Koehler's own transaction-specific information. *See* Koehler Br. 41-46. As the trial court held in *Koehler I*, the "arguments are unavailing . . . because Commerce is expressly permitted by statute to rely on secondary information such as the petition rate" so long as it is adequately corroborated. 7 F. Supp. 3d at 1315-16.

First, Koehler argues (unpersuasively) that it was unlawful for Commerce to use the petition rate as AFA because it was only partially based on Koehler's own data. *See* Koehler Br. 24-25. Contrary to Koehler's argument, the antidumping statute *explicitly authorizes* Commerce to rely on petition rates as AFA so long as Commerce adequately corroborates them—and there is no requirement that the AFA rate be based on data from the uncooperative party at issue. *See Koehler I*, 7 F. Supp. 3d at 1315-16. Indeed, it is common for an AFA rate to reflect data from entities other than the uncooperative party. *See*, *e.g.*, *Dongtai Peak*, 777 F.3d at 1354-55 (AFA rate calculated using data for different respondent in prior review); *Shanghai Taoen Int'l Trading Co. v. United States*, 360 F. Supp. 2d 1339, 1347 (Ct. Int'l Trade 2005) (223.01 percent AFA rate stemming from other respondent); *NSK Ltd. v. United States*, 346 F. Supp. 2d 1312, 1335 (Ct. Int'l Trade 2004) (same–73.55 percent AFA rate); *Hubscher Ribbon Corp. v. United States*, 942 F.

Supp. 2d 1375, 1381-82 (Ct. Int'l Trade 2013) (petition rate corroborated with other respondents' data).

Thus, even if the petition rate were based *entirely* on another company's data, that would not render it unreliable as a basis for Koehler's AFA rate because it has been adequately corroborated, as we establish below. *See* JA1949-50 (addressing arguments). If anything, that the petition rate in this case *does* reflect a reasonable amount of Koehler's own information—such its average factory overhead, selling, general & administrative expenses (SG&A), financial expense rates, and profit rates—reinforces the propriety of Commerce using it as AFA.[7] Koehler also relies incorrectly on *Shandong Huarong General Group Corp. v. United States*, in which the court held that Commerce failed to demonstrate that an AFA rate stemming from another respondent was relevant to the plaintiff. *See* 29 CIT 1227, 1231-32 (2005). Nothing in that case supports Koehler's argument that the petition rate in this case, which is actually based in part on Koehler's information, cannot serve as an adequately corroborated AFA rate.

---

[7] Koehler purports to calculate the percentage of the normal value Commerce used for the petition rate attributable to its own data—an argument that it did not raise before either Commerce or the trial court. *See* Koehler Br. 24. The Court should neither consider nor credit the argument because it is improper for Koehler to raise it for the first time on appeal, depriving both Commerce and the trial court of the ability to analyze and to address the alleged calculations in the first instance. *See JBF RAK LLC v. United States*, 790 F.3d 1358, 1366 (Fed. Cir. 2015) (exhaustion); *Gant v. United States*, 417 F.3d 1328, 1332 (Fed. Cir. 2005) (waiver).

Koehler next argues that the petition rate bears no relationship to its experience because the rate is significantly higher than Koehler's calculated rates in other segments of the proceeding, emphasizing repeatedly that the petition rate is approximately 11 times higher than Koehler's highest calculated rate from segments in which it cooperated.  *See* Koehler Br. 11, 23, 26-30.

This Court's decision in *Ad Hoc Shrimp* directly contradicts Koehler's reasoning.  The Court in *Ad Hoc Shrimp* affirmed as reasonable Commerce's selection of an AFA petition rate that the appellants asserted was "*twelve times higher than the highest rate ever calculated for a cooperative respondent*"—and in doing so rejected essentially the same argument that Koehler makes now.  2015 WL 5781477, at *17-18 (rejecting argument that "{g}iven this history of extremely low margin results extending over multiple years, it is plainly evident that the 112.81% rate from the petition does not reflect commercial reality and is punitively high").  The Court also rejected as flawed the appellant's attempt to compare the AFA rate to those of cooperative respondents.  *See id.*

Moreover, the Court has repeatedly clarified that AFA rates can be significantly higher than rates calculated for cooperating respondents.  *See*, *e.g.*, *Ad Hoc Shrimp*, 2015 WL 5781477, at *18; *KYD*, 607 F.3d at 765-66 (using petition rate many times higher than those of cooperating respondents).  This is so because AFA rates reflect an "inference that is adverse to the interests of that party."  *Ad*

*Hoc Shrimp*, 2015 WL 5781477, at *18 (quoting 19 U.S.C. § 1677e(b)); *Ta Chen*, 298 F.3d at 1339 ("In cases in which the respondent fails to provide Commerce with the most recent pricing data, it is within Commerce's discretion to presume that the highest prior margin reflects the current margins.") (citation omitted).

Also similar to *Ad Hoc Shrimp*, Koehler's comparisons with other reviews are especially poor because they rely on Koehler's invalidated rate for the second review during which Koehler's scheme began, and in which Commerce after seeking a voluntary remand to cleanse its proceedings of fraud assigned Koehler the same 75.36 percent AFA rate applied in this review, as well as the fourth and fifth reviews post-dating this one, which largely occurred after Koehler's scheme came to light. *Compare* Koehler Br. 26-28 *with Ad Hoc Shrimp*, 2015 WL 5781477, at *18 (holding that it was improper to compare AFA rate to respondent's rates from reviews affected by transshipment scheme).

The trial court used reasoning similar to *Ad Hoc Shrimp* to reject Koehler's arguments: "Koehler's previous margins are not indicative of its commercial reality during {the third review} and are, in fact, inadequate for the purpose of establishing Koehler's AFA rate." *Koehler I*, 7 F. Supp. 3d at 1316. Because "Koehler cooperated during the investigation and the first review, but during {the third review} Koehler concealed sales that would have resulted in . . . a higher dumping margin{,} . . . it was reasonable for Commerce to reject the established

rates and instead select a rate which accounted for this conduct along with a 'built-in' increase for deterrence purposes." *Id.* (quoting *F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000)).  In other words, the segments in which Koehler did not conceal sales are not an adequate indicator of Koehler's behavior in *this* review, in which it did conceal sales.

Additionally, it would be highly inappropriate for the Court to rely on Koehler's self-serving representation positing what its dumping rate would be if Commerce were to accept and to include in its calculations Koehler's alleged accounting of its concealed sales.  *See* Koehler Br. 28; *Koehler I*, 7 F. Supp. 3d at 1318 n.9 (declining to credit representation because data was not part of the record before Commerce).  This assertion is improper on multiple levels because (1) it would be contrary to the integrity of Commerce's proceedings to permit a party that deliberately concealed information to then rely on the information it withheld; (2) Commerce has determined that Koehler's actions rendered its overall reporting for the review unreliable, which extends to its *post hoc* claims about the scope of its concealed sales; and (3) Commerce  properly excluded this information, and even if the Court were to disagree, it would be Commerce's role to analyze the information in the first instance.  *See PSC VSMPO–AVISMA Corp. v. United States*, 688 F.3d 751, 761 (Fed. Cir. 2012) (judicial review "is limited to determining whether the record is adequate to support the administrative action").

Finally, the case law that Koehler cites does not support its position.

Koehler, for example, cites *De Cecco* for the proposition that Commerce cannot

rely on a petition rate that has been "discredited" by the calculation of lower rates.

*See* Koehler Br. 29-30.  In that case, however, Commerce determined that a

company in the investigation had been uncooperative and applied as total AFA an

*uncorroborated* petition rate.  *See De Cecco*, 216 F.3d at 1032.  The Court thus

held that this *uncorroborated* rate had been discredited because there were other

verified rates for high-end producers that had been corroborated and could serve as

an adverse rate.  *See id*.  Indeed, the Court in *De Cecco* explicitly recognized that

"the statute has no requirement that Commerce is limited to the highest rate

imposed on a cooperating company when selecting a rate for a non-cooperating

respondent" and further that "the statute explicitly allows for use of 'the petition'

to determine relevant facts when a respondent does not cooperate."  *See id*. (citing

19 U.S.C. § 1677e(b)).  Consequently, nothing in *De Cecco* requires Commerce to

disregard a petition rate that is corroborated by other record evidence.  *See Ta*

*Chen*, 298 F.3d at 1339 (distinguishing *F.lii De Cecco* when AFA margin had been

corroborated by data reflecting some, albeit small portion, of party's actual sales).

Koehler's reliance on *Gallant Ocean (Thailand) Co. v. United States*, 602

F.3d 1319 (Fed. Cir. 2010), is equally unavailing.  In *Gallant Ocean*, the Court

concluded that the petition rate that Commerce used as AFA suffered from several

flaws, including the fact that it was uncorroborated. *See id*. at 1324 (explaining, after recognizing that petition rate was higher than rates calculated for cooperative respondents, that "nothing in the record ties the adjusted petition rate to Gallant, because Gallant did not participate in the original investigation"); *see also id*. at 1324-25 (distinguishing *Ta Chen* and *PAM* on grounds that, in those cases, as in this one, Commerce was able to tie AFA rate to uncooperative respondents' actual sales). Consequently, *Gallant Ocean* does not alter the statutory directive that, so long as Commerce corroborates a petition rate to the extent practicable, Commerce can use that rate as an AFA rate.

### C.  Commerce's Corroboration Analysis Was Reasonable

The trial court correctly held that Commerce adequately corroborated the petition rate using the range of Koehler's reported transaction-specific dumping margins from the previous review. *See Koehler I*, 7 F. Supp. 3d at 1316-18.

As we established above, section 1677e(b) explicitly authorizes Commerce to rely on secondary information, such as information from the petition, in assigning a total AFA rate to an uncooperative party. When Commerce does so, the statute also requires Commerce—to the extent practicable—to corroborate the secondary information using data from independent sources reasonably available at its disposal. *See* 19 U.S.C. § 1677e(c). Commerce's regulations provide that these independent sources may include published price lists, official import statistics and

customs data, and information from interested parties. *See* 19 C.F.R. § 351.308(d). The SAA relatedly states that to "corroborate" means that Commerce will satisfy itself that the information has probative value. *See* SAA at 870. Commerce evaluates whether secondary information has probative value by assessing its reliability and relevance. *See* JA1732R.[8]

To corroborate the 75.36 percent rate to the extent practicable in this case, Commerce examined the transaction-specific sales margins that Koehler reported in the second review, and that Appvion had placed on the record in this review. *See* JA1947-49. Specifically, Commerce determined that the 75.36 percent rate was relevant and reliable because it "fell within the range of transaction-specific margins calculated for Koehler in {the second review}, the highest of which was 144.63 percent." JA1948 (citing JA1732R). In doing so, Commerce explained that "{t}he margin calculation data from {the second review} is relevant for purposes of corroboration because it is Koehler's own data and thus reflective of its commercial practices in regard to this proceeding." JA1948. Commerce also emphasized that it had *not chosen* the 144.63 percent rate from among Koehler's transaction-specific margins as the AFA rate, but rather cited it to show that the

---

[8] Although TPEA Section 502 is prospective in nature, Congress in Section 502 clarified that corroboration does *not* require Commerce to analyze what an uncooperative party's dumping rate or "commercial reality" would be if it had cooperated in the review. *See* Pub. L. No. 114-27 § 502(3); S. Rep. 114-45, at 38 (2015) (describing identical precursor legislation as clarifying requirements).

75.36 petition rate was within the overall range of Koehler's transaction-specific margins for the second review. *See id.*

Commerce also recognized several relevant considerations: (1) Koehler has been the only respondent in the history of this proceeding; (2) the information sources at Commerce's disposal for corroboration purposes were limited; and (3) Koehler's second review data excluded certain home market sales that it had concealed as part of the transshipment scheme to avoid antidumping requirements (in other words, because the transshipment scheme started during the second review, the data Koehler chose to report presented a more conservative picture of its margins than if Koehler had reported its data accurately). *See* JA1947-49.

Koehler's primary arguments on appeal are that the 144.63 percent margin that was the highest in the range of margins that Commerce examined in its corroboration analysis is aberrational because it is based on a single low-volume and high-value sale, *see* Koehler Br. 33-37, and that Commerce's reliance on data from the second review conflicts with Commerce's own second review findings regarding Koehler's data. *See* Koehler Br. 38-39. These contentions lack merit.

First, contrary to Koehler's contention that Commerce effectively "cherry-picked" the 144.63 percent margin (*see* Koehler Br. 33), Commerce reiterated that its analysis did not rely solely on a single margin. Rather, Commerce determined that the 75.36 percent petition rate (considerably lower than 144.63 percent) was

probative of Koehler's reality because it fell within the range of Koehler's second review margins. *See* JA1948. The 75.36 percent AFA rate is considerably closer to the next highest (albeit somewhat lower) margin of 48.68 percent, than to the 144.63 percent margin at the top end of the range. As the trial court held:

> {T}here is no evidence that Commerce simply 'cherry-picked' the highest margin, as Koehler insists. Commerce did not select the 144.625% margin as Koehler's actual AFA rate, but instead used it to establish an upper boundary for a range of transactions that reflected Koehler's commercial reality. And, in fact, the petition rate was well below the 144.625% margin.

*Koehler I*, 7 F. Supp. 3d at 1317. Commerce also explained that, if Koehler had accurately reported its home market sales in the second review, including those it concealed to avoid higher margins, there may well have been more high-margin transactions corroborating the 75.36 percent rate. *See* JA1948-49; *see also* JA1042 (scheme intended to make non-compliant sales); JA1426 (public allegations that Koehler concealed high-margin sales to manipulate margin were "substantially correct"). Koehler should not benefit from having concealed those transactions.[9] Moreover, as this Court stated in *De Cecco*, the notion of an AFA rate is *intended* to reflect a built-in increase to deter non-compliance. *See* 216 F.3d at 1032.

---

[9] For similar reasons, the chart on page 34 of Koehler's brief is not an accurate depiction of its actual margins. *See* JA1949 ("we {cannot} find credible Koehler's argument . . . concerning the quantity of sales with calculated transaction-specific margins below 75.36 percent"); *Koehler I*, 7. F. Supp. 3d at 1317 ("{I}t was reasonable for Commerce to conclude that the actual {second review} margins exceeded those which Commerce calculated using the data Koehler provided.").

Next, regarding Koehler's contentions about the size of the sale yielding the 144.63 percent margin, *see* Koehler Br. 36-37, Commerce explained that its practice is not to "consider a transaction-specific margin to be aberrational solely on the basis of the quantity" (as Koehler itself acknowledged).  JA1948.  Applying the principle to this case, Commerce explained that Koehler had "offer{ed} no reason to reject this transaction-specific margin used in the corroboration exercise other than its belief that the margin is too high."  *Id.*; *see also* JA2071 n.7 (noting that Koehler made many other sales in similar quantities).  The trial court correctly affirmed Commerce's determination, holding that Koehler's reliance on these figures "{w}ithout any explanatory evidence concerning the sale at issue" did not undermine Commerce's determination "that the numerical differences alone were insufficient to undermine the reliability of the 144.625% margin."  *Koehler I*, 7 F. Supp. 3d at 1318 (citations omitted); *see also U.S. Steel Corp. v. United States*, 712 F. Supp. 2d 1330, 1342 (Ct. Int'l Trade 2010) (holding that party cannot "prove distortion simply by pointing to contrasting figures").

Nor is Commerce prohibited from using a small number of sales to corroborate an AFA rate.  The trial court correctly held that "the facts of this case substantially support Commerce's reliance on the transaction-specific margins."  *Koehler I*, 7 F. Supp. 3d at 1317; *see also* JA1949 (discussing relevant authority).  This Court has upheld reliance on data that is "reflective of some, albeit a small

portion, of {a party's} actual sales," including data representing a single sale, so long as the data is corroborated. *PAM*, 582 F.3d at 1340 (*quoting Ta Chen*, 298 F.3d at 1339); *see also Fujian Lianfu Forestry Co., Ltd. v. United States*, 700 F. Supp. 2d 1361, 1362-63 (Ct. Int'l Trade 2010). The Court has likewise "made clear . . . that Commerce need not select, as the AFA rate, a rate that represents the typical dumping margin for the industry in question." *KYD*, 607 F.3d at 765-66 (citing *Ta Chen* and *PAM*). In this case, Commerce established that the range of second review data on which it relied was Koehler's own data reflecting Koehler's commercial practices (even after other high margin transactions were concealed), making it relevant to and probative of Koehler's actual experience. *See* JA1948.

Conversely, Koehler's reliance on *Gallant Ocean* in support of its aberration claims is misplaced. *See* Koehler Br. 35-37. Although in *Gallant Ocean* the Court held that an AFA rate was insufficiently corroborated, that holding does not alter the statutory authorization for Commerce to rely on the petition rate as AFA in this case, when Commerce has determined, to the extent practicable, that the petition rate is reliable and relevant to Koehler. *See* 19 U.S.C. §§ 1677e(b) and (c).

In *Gallant Ocean*, the Court was concerned that Commerce had attempted to corroborate a petition rate applied to a new exporter that had failed to participate in a review using transaction-specific margins from *other exporters*. The Court held that "nothing in the record ties the adjusted petition rate to Gallant, because Gallant

44

did not participate in the original investigation." 602 F.3d at 1324. By contrast, Koehler participated in this investigation, the petition rate stemmed in part from Koehler, and Commerce's corroboration analysis relied on Koehler's own data. *See* JA1949-50. Indeed, *Gallant Ocean* specifically distinguished *Ta Chen* and *PAM* because Commerce in those cases (as in this one) tied the AFA rate to the parties' actual sales. *See* 602 F.3d at 1324-25. Hence, based on *Gallant Ocean's* own terms, this case is more similar to *Ta Chen* and *PAM* than to *Gallant Ocean*.

In addition, as the trial court recognized, *Gallant Ocean* involved a situation in which *numerous* voluntary respondents had received calculated rates that, in turn, informed the unreasonableness of using a petition rate as AFA. *See Koehler I*, 7. F. Supp. 3d at 1317. In this case, by contrast, (1) Koehler has been the only respondent in the history of this proceeding and (2) the information sources at Commerce's disposal for corroboration purposes were limited due to Koehler withholding the "very information that {Commerce} needs to link {the} AFA rate to {Koehler's} commercial reality." *Id*. (quoting *Qingdao Taifa Grp. v. United States*, 780 F. Supp. 2d 1342, 1349 (Ct. Int'l Trade 2011)); JA1947-49 (discussing same). Congress recognized that this might occur when it included the proviso "to the extent practicable" in the statute. 19 U.S.C. § 1677e(c); H.R. Rep. 103-826, at 105 (1994), *reprinted in*, 1994 U.S.C.C.A.N. 3773 ("The fact that corroboration

45

may not be practicable in a given circumstance will not prevent the agencies from applying an adverse inference under subsection (b).").

Koehler also contends that alternative corroboration sources were available, including its reported third review sales and data from the investigation or first review. Regarding Koehler's third review sales data, Commerce correctly declined to use it, determining that it was not adverse and that "we cannot consider a rate which relies on data from the instant review, as we have found Koehler's home market sales data to be unreliable and unusable." JA1950-51. Further, Koehler's investigation and first review data are not on the record of this review.

Finally, Commerce's reliance on Koehler's reported second review data for the *limited* purpose of corroboration is not inconsistent with its determination in the second review remand that the data was unusable for the *broader* purpose of calculating a dumping margin. The trial court sensibly held "{t}hat Commerce found Koehler's data to be unreliable for the purpose of calculating a weighted average dumping margin does not affect its use of transaction-specific margins from that data for the separate purpose of corroborating an AFA rate." *Id.*; *see also Koehler II*, 44 F. Supp. 3d at 1358. Thus, contrary to Koehler's claim, Commerce is not "hav{ing} it both ways." Koehler Br. 39. Indeed, Commerce recognized that because Koehler concealed certain higher-priced home market sales in the second review, the corroboration analysis was conservative. *See* JA1948-49. This

use of imperfect data still satisfies the statutory requirement to corroborate the use of secondary information "to the extent practicable."

### D. **Commerce's Use Of The 75.36 Percent AFA Rate Is Not Punitive**

Contrary to Koehler's claims, the 75.36 percent rate is not punitive. *See* Koehler Br. 39-42. Commerce explained in its final results that "{b}y definition, a rate based on inferences adverse to Koehler will normally be higher than the other rates in the proceeding which were calculated without an adverse inference, in order to serve as a deterrent to non-compliance." JA1950. Thus, such a rate "may well be uncomfortably high for a respondent, as it appears to be for Koehler in this case, but the high level, in and by itself, does not make the rate punitive." *Id.*

This Court has held squarely—in affirming Commerce's application of a 122.68 AFA rate over 100 times greater than the average of the calculated rates in the review—that "an AFA dumping margin determined in accordance with the statutory requirements is not a punitive measure, and the limitations applicable to punitive damages assessments therefore have no pertinence to duties imposed based on lawfully derived margins such as the margin at issue in this case." *KYD*, 607 F.3d at 768. Applying this precedent, the trial court held that "{a}lthough the petition rate exceeded Koehler's previous margins, it was not punitive because it was properly corroborated." *Koehler I*, 7 F. Supp. 3d at 1318. Thus directly contradicts Koehler's argument that the 75.36 percent rate is punitive.

47

## IV.    Commerce's Rejection Of Koehler's Concealed Home Market Sales Was Lawful And Not An Abuse of Discretion

The trial court correctly held that Commerce's determination not to accept Koehler's *post hoc* submission of its concealed sales was lawful. *See Koehler I*, 7 F. Supp. 3d at 1312-13; JA1938-41. Only after Appvion disclosed Koehler's scheme did Koehler attempt to report its concealed sales. Koehler now contends that by declining to allow Koehler to remedy this "deficiency" Commerce violated 19 U.S.C. §§ 1677m(d) and (e) and abused its discretion. *See* Koehler Br. 43-56.

As an initial matter, even if Commerce were required to accept Koehler's concealed sales, that would not alter Commerce's determination that Koehler's fraudulent scheme rendered its overall reporting unreliable. *See* JA1732P (allowing Koehler to submit revised sales data would not result in response in which Commerce could rely on data's veracity); JA1937 (same). We nonetheless address each of Koehler's contentions below.

### A. Commerce Satisfied The Requirements Of 19 U.S.C. § 1677m(d), To The Extent They Are Applicable

Section 1677m(d) provides that if Commerce "determines that a response to a request for information . . . does not comply with the request, . . . {it} shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency" in light of the time limits for completing the

review.  19 U.S.C. § 1677m(d).  If the response remains deficient, Commerce may

disregard it subject to the criteria set forth in 19 U.S.C. § 1677m(e) that it "shall

not decline to consider" necessary information provided that satisfies each of five

conditions set forth in section 1677m(e).  The section 1677m(e) requirements

include that the information be timely and verifiable, *and* that the respondent has

cooperated to the best of its ability.

Section 1677(d) does not affect a situation like this one, in which a party

deliberately falsifies its sales data, rendering its overall reporting unreliable.  In

such a situation, belatedly submitting an alleged accounting of the concealed sales

does not "remedy" the "deficiency" caused by the fraudulent behavior.  Thus, the

Court of International Trade has held in similar circumstances that the "remedial

provisions" of section 1677m(d) "are not triggered unless the respondent has met

*all* of the five enumerated criteria of section 1677m(e)."  *Koehler I*, 7 F. Supp. 3d

at 1312 (quoting *Tung Mung Dev. Co. v. United States*, 25 C.I.T. 752, 789 (2001))

(quotation marks omitted).  Koehler, as we discuss below, failed to satisfy *any* of

section 1677m(e)'s criteria by submitting its concealed sales only once its scheme

came to light four months after the reporting deadline.

In any event, Commerce complied with section 1677m(d)'s requirement that

it permit a party, to the extent practicable, to "remedy *or explain*" a deficiency by

accepting and considering Koehler's explanation for its false reporting.  In *Myland*

*Industrial, Ltd. v. United States*, for example, the Court of International Trade rejected an argument essentially identical to Koehler's. *See* 31 C.I.T. 1696, 1704-05 (2007). It held that "{t}he statute . . . requires that Commerce permit a party the opportunity 'to remedy *or explain*' the deficiency. Myland's post-preliminary rebuttal brief apparently attempted to do just that, *i.e.*, take advantage of the opportunity to explain." *Id*. Consequently, to the extent section 1677m(d) applied in this case, Commerce satisfied its terms by providing Koehler an opportunity to explain its deficient reporting in its submissions regarding Appvion's allegations.[10]

Commerce addressed section 1677m(d) at length in the review. JA1732K, 1938-40. First, evaluating Koehler's claim that section 1677m(d) required Commerce to issue Koehler a "deficiency questionnaire" after its scheme emerged, Commerce explained that, contrary to the thrust of section 1677m(d), Koehler had made material misrepresentations that rendered its overall reporting unreliable, so it would not be appropriate to issue a further questionnaire to allow Koehler to remedy the significant and intentional deficiency. *See* JA1732K. Commerce elaborated in its final results that the "deficiency" at issue was not due to an error on Koehler's part, but Koehler's intentional submission of deficient, incomplete,

---

[10] Koehler's interpretation that section 1677m(d) creates an option for it to choose either to remedy or to explain a deficiency is untenable—the statute simply gives Commerce discretion to apply the appropriate action for the circumstances, and it is certainly not intended to require Commerce to allow uncooperative respondents the option of remedying deliberately falsified submissions. *See* Koehler Br. 46 n.8.

and fraudulent responses.  *See* JA1938.  It additionally determined that Koehler did

not need Commerce to inform it of the "deficiency" in its reporting, had multiple

opportunities to correct the deliberate deficiency, and made no attempt to do so

unit after its scheme was revealed.  *See* JA1940; *see also* JA1939 ("Koehler had

been aware of the deficiency in its own reporting from the time it embarked on the

transshipment scheme").  Thus, Commerce fulfilled its duties by accepting and

considering Koehler's explanation, while rejecting the concealed sales reporting as

unsolicited and untimely new factual information.  *See* JA1364-65, 1940.

Koehler cites three cases to support its argument that Commerce failed to

satisfy section 1677m(d), none of which is on point.  Koehler first cites *Timken* for

the proposition that "there is no basis for restricting a respondent's right to correct

errors based on the type of error involved."  Koehler Br. 44.  Again, however, this

is not a case in which a party provided information to correct an "error" in data

already on the record, but one in which Koehler purposefully withheld information

and sought to provide the concealed information only after the scheme came to

light.  As the trial court correctly held, because *Timken* did not involve a failure to

cooperate, it does not require Commerce to accept Koehler's withheld sales under

1677m(d).  *See Koehler I*, 7 F. Supp. 3d at 1312-13 (citations omitted).

Koehler also cites *Agro Dutch Industries Ltd. v. United States* and *China

Kingdom Imp. & Exp. Co. v. United States*.  *See* Koehler Br. 44-47.  In *Agro*

51

*Dutch*, however, Commerce had issued a deficiency questionnaire and the respondent had provided a response that met the section 1677m(e) requirements. *See* 31 C.I.T. 2047, 2055 (2007)). In that different context, the Court determined that "whatever reasons for {the prior submissions} having been deficient earlier in the proceeding are rendered irrelevant, because there is now no longer a 'gap' in the information necessary for the proceeding." *Id*. Likewise, the plaintiff in *China Kingdom* affirmatively provided information "solely to correct its earlier response to the Department's questionnaire." 507 F. Supp. 2d 1337, 1350 (Ct. Int'l Trade 2007). Neither case presented a scenario in which a party concealed sales until another party brought its fraudulent scheme to light.

Koehler's additional arguments are also meritless. Commerce not rejecting routine corrections that Koehler provided in its supplemental questionnaire response does not demonstrate that Commerce should have accepted Koehler's wholly concealed sales. *See* Koehler Br. 45-46. The corrected information is different from concealed sales data that were deliberately excluded from the initial questionnaire response and that Commerce did not solicit in its supplemental questionnaire. Nor was Commerce required to accept Koehler's revised home market sales database because of the amount of time left in the proceeding. *See* Koehler Br. 45-47. Commerce permitted Koehler the opportunity to explain its false reporting in light of the relevant time limits; nothing more was required.

In sum, to permit Koehler the opportunity to remedy its "deficient" reporting by submitting its "corrected" home market sales database after its transshipment scheme was revealed would allow respondents to submit misleading responses with impunity.  *See Tianjin Magnesium I*, 844 F. Supp. 2d at 1348 (discussing the perverse incentives created by Koehler's position).  Consequently, Koehler's claim that Commerce failed to meet section 1677m(d) should be denied.

## B. Koehler Did Not Satisfy The Requirements Of 19 U.S.C. § 1677m(e)

Commerce properly rejected Koehler's concealed sales information because Koehler failed to satisfy the 19 U.S.C. § 1677m(e) requirements.  Section 1677m(e) states that Commerce will not decline to accept information that may be deficient in certain respects, so long as:  (1) the information is submitted by the established deadline; (2) the information can be verified; (3) the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination; (4) the interested party has demonstrated that it acted to the best of its ability; and (5) the information can be used without undue difficulties.

In this case, Commerce determined that, "at a minimum, Koehler has not complied with the requirements of section {1677m782(e)} because it failed to act to the best of its ability to provide a complete home market sales database, it failed to provide its response within the applicable time limits, and it provided information which could not be verified."  JA1941.   A "{f}ailure to fulfill any one

53

criterion {under § 1677m(e)} renders § 1677m(d) inapplicable." *Tung Mung*, 25 C.I.T. at 789.  Thus, as the trial court correctly held, Commerce reasonably determined that Koehler's post-disclosure submission of its previously concealed sales failed to satisfy the section 1677m(e) requirements, warranting rejection of the information.  *See Koehler I*, 7 F. Supp. 3d at 1312, 1314.

Koehler's claims that it satisfied each of the five section 1677m(e) criteria in submitting its concealed sales are meritless.  First, contrary to Koehler's claims (Koehler Br. 48-49), Koehler's revised home market sales database was not timely because it was submitted months after the February 2012 deadline.  JA1940-41.  As the trial court held, in granting Koehler an extension to submit its supplemental questionnaire response, Commerce neither requested nor authorized Koehler to submit its concealed sales.  *See Koehler I*, 7 F. Supp. 3d at 1312; JA1937.  Indeed, Commerce issued the supplemental questionnaire prior to Appvion's allegations, and the questionnaire itself was focused on sales that Koehler had already reported.  *See* JA492.  Moreover, in seeking an extension, Koehler never indicated, implicitly or otherwise, that it intended to file a revised database containing its previously concealed home market sales because it had characterized the allegations as "{f}ictional."  JA938, 958-59.  Thus, Commerce's granting Koehler's extension request using its standard "unique circumstances" language was not an invitation for Koehler to provide the concealed sales.  JA963.

Second, Commerce's conclusion that Koehler's missing sales data could not be verified was not based on "mere speculation." Koehler Br. 49-51. Commerce explained that its "standard verification procedures were not established to confirm the veracity of this type of sales information, which would require extraordinary measures outside the scope of a typical sales verification." JA1732J. Verification is designed to confirm reported information, not analyze the extent of information that was fraudulently concealed. That Commerce verified Koehler's *reported* sales in the fourth review, including some that were transshipped, does not demonstrate that Commerce could have verified Koehler's *concealed* home market sales in the third review. *See Koehler I*, 7 F. Supp. 3d at 1312 n.7. Moreover, this case is clearly different than the *NTN Bearing* and *Timken* cases that Koehler cites; those cases involved parties submitting corrective information for data already on the record, not a situation where a party deliberately withheld sales data as part of a scheme to manipulate its margin. *See NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1207-08 (1995); *Timken*, 434 F.3d at 1347-48.

Koehler's references to the World Trade Organization (WTO) Antidumping Agreement (Koehler Br. 50-51) are equally unavailing. Koehler did not present this argument either to Commerce or to the trial court, meaning that Koehler has both failed to exhaust and waived it. *See JBF RAK*, 790 F.3d at 1366 (exhaustion); *Gant*, 417 F.3d at 1332 (waiver). Moreover, the argument is meritless. This Court

55

has held repeatedly that WTO law and decisions are not binding on the United States or this Court.  *See*, *e.g.*, *Timken Co. v. United States*, 354 F.3d 1334, 1344 (Fed. Cir. 2004); *Corus Staal BV v. United States*, 395 F.3d 1343, 1349 (Fed. Cir. 2005) (Court accords no deference to WTO cases, and refuses to overturn Commerce practice "based on any ruling by the WTO or other international body until such ruling has been adopted pursuant to the specified statutory scheme").  In addition, the Court has specifically held that the "persuasive value" of WTO authority was insufficient to render Commerce's established practices improper. *Timken*, 354 F.3d at 1344.  Nor does the WTO decision that Koehler cites require Commerce to attempt to verify information before rejecting it following a party's deliberate attempts to conceal the information from Commerce.

Third, contrary to Koehler's argument (Koehler Br. 51), Commerce did determine that the entirety of Koehler's reporting, including its supplemental questionnaire response, was unreliable:  "Where a respondent engages in conduct like Koehler's, it call{s} into question the accuracy of all the information that it provided during the course of the review, and the Department's established practice is to treat the entire response as unreliable."  JA1732I-J (citation and quotation marks omitted); *see also* JA1941 (stating that Koehler failed to provide complete home market sales database); JA1729, 1937 (allowing Koehler to submit revised sales data would not resuscitate reliability).

Fourth, Commerce lawfully determined that Koehler failed to act to the best of its ability. *See Koehler I*, 7 F. Supp. 3d at 1312 ("At a minimum, this evidence demonstrates that Koehler did not 'put forth its maximum effort to provide Commerce with full and complete answers' to a request for information.") (quoting *Nippon Steel*, 337 F.3d at 1382). Contrary to Koehler's assertion, this is not an instance in which Koehler merely "fai{ed} to submit data in the first response." Koehler Br. 51-52. Koehler deliberately engaged in a scheme to conceal sales that it did not admit until confronted. Additionally, Commerce lawfully determined that "Koehler's remedial efforts did not reestablish its cooperation with the review." *Koehler I*, 7 F. Supp. 3d at 1311; *see also* JA1732O-P, 1942-43.

Fifth, contrary to Koehler's assertion (Koehler Br. 52), Commerce could not have used Koehler's concealed sales data without undue difficulty. In particular, Commerce had ample basis to find Koehler's data unusable "due to Koehler's material omission of this essential sales data and the facts surrounding how Koehler intentionally concealed its home market sales information until Petitioner's allegations were submitted on the record of this review." JA1732I-J. Koehler's reliance on *NSK Ltd. v. United States* (Koehler Br. 52) is misplaced, given that in *NSK*, unlike this case, Commerce found that the company had acted to the best of its ability and that accepting its information was not "unreasonably distortive." 170 F. Supp. 2d 1280, 1318-19 (Ct. Int'l Trade 2001).

## C. **Commerce Did Not Abuse Its Discretion In Rejecting Koehler's Data**

Finally, the trial court correctly held that Commerce's rejection of Koehler's missing sales data was not an abuse of discretion. *See Koehler I*, F. Supp. 3d at 1312-13. First, Koehler's continued reliance on *NTN Bearing* and *Timken* is misplaced because Koehler's attempt to supplement the record with sales that it had previously concealed once its scheme came to light is not analogous to the "errors" that courts have permitted parties to correct. Thus, regardless of how long before the preliminary results Koehler's submission occurred, Commerce did not abuse its discretion in rejecting it. *See Koehler I*, 7 F. Supp. 3d at 1313 (citing *Yantai Timken Co. v. United States*, 521 F. Supp. 2d 1356, 1370 (Ct. Int'l Trade 2007)). Moreover, this Court has held explicitly that it "cannot set aside application of a proper administrative procedure because it believes that properly excluded evidence would yield a more accurate result." *Avisma*, 688 F.3d at 761.

Second, as we established above, Koehler's reliance on WTO materials is improper because Koehler raised the argument for the first time on appeal and because the argument is unpersuasive. Contrary to Koehler's claims, this is not an instance where a party merely failed to meet a deadline. Koehler purposefully withheld information until confronted with allegations of its scheme and thereby significantly impeded the proceeding. *See Koehler I*, 7 F. Supp. 3d at 1314.

## <u>CONCLUSION</u>

For these reasons, we respectfully request that the Court affirm the trial court's judgment and sustain Commerce's final results in their entirety.

Respectfully submitted,

BENJAMIN C. MIZER
Principal Deputy Assistant
Attorney General

JEANNE E. DAVIDSON
Director

/s/  Reginald T. Blades, Jr.
REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:                               /s/  Joshua E. Kurland
JESSICA M. LINK                          JOSHUA E. KURLAND
Attorney                                         Trial Attorney
Office of the Chief Counsel            Department of Justice
for Trade Enforcement and Compliance    Commercial Litigation Branch
U.S. Department of Commerce      P.O. Box 480
Washington, DC 20230                 Ben Franklin Station
                                                      Washington, D.C.  20044
                                                      Tel: (202) 616-0477
                                                      Fax: (202) 307-0972
                                                      Joshua.E.Kurland@usdoj.gov

October 18, 2016                          *Attorneys for Defendant United States*

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION, TYPEFACE
## <u>REQUEIREMENTS, AND TYPE STYLE REQUIREMENTS</u>

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned certifies that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B)(i). Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(a)(7)(B)(iii), this brief includes 13,992 words.

This brief has been prepared in Microsoft Office Word using a proportionally spaced typeface (14 point Times New Roman font).  In preparing this certificate, the undersigned has relied upon the word count feature of this word-processing system as permitted by Fed. R. App. P. 32(a)(7)(C)(i).

<u>/s/ Joshua E. Kurland</u>

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on this 18th day of October, 2016, a copy of the foregoing CORRECTED BRIEF OF DEFENDANT-APPELLEE THE UNITED STATES was filed electronically.

__X__ This filing was served electronically to all parties by operation of the Court's electronic filing system.

_____ A copy of the confidential version of this filing is being served via:

_____ hand delivery

_____ mail

_____ third-party commercial carrier for delivery within 3 days

_____ electronic means, with written consent of the party being served

to the following addresses:

/s/ Joshua E. Kurland